615 S.E.2d 615 (2005)
273 Ga. App. 554
In the Interest of M.L.S., a child.
No. A05A0423.
Court of Appeals of Georgia.
June 7, 2005.
*617 Mark J. Nathan, Savannah, for Appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Leo G. Beckmann, Jr., Savannah, for Appellee.
ADAMS, Judge.
The father of M.L.S. appeals the termination of his parental rights. He contends the evidence was insufficient to support the decision and that the court erred by failing to consider placing the child with the paternal grandmother.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. In the Interest of S.H., 251 Ga.App. 555(1), 553 S.E.2d 849 (2001). "We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citation and punctuation omitted.) In the Interest of C.F., 251 Ga.App. 708, 555 S.E.2d 81 (2001).
Following a hearing held on December 22, 2000, the juvenile court determined that ten-year-old M.L.S., was deprived because of neglect. The father did not appeal this order. As stated in the trial court's order,
He has attended school dirty, unkempt, and smelly to a degree that is not ordinary among active children. His self-care skills are poor for a child his age. In addition, he has told others that his father comes home drunk and acts abusively towards his mother. Although his I.Q. is 107, he is developmentally delayed. He cannot tie his shoes, and he has trouble controlling his bladder. Whether these difficulties are physiological or the result of neglect is not clear. But he should be evaluated to determine what steps should be taken next.
The court also found that the father had been convicted several times for DUI and at least once for theft, and that neither the father nor the mother had a driver's license at the time.
A subsequent review by the court found that the father "continued to abuse alcohol and was tragically involved in an automobile collision that resulted in the death of an eight-year-old child." He was arrested and charged with vehicular homicide, auto theft, DUI and driving without a license. On December 18, 2001, the father pleaded guilty to theft by taking, DUI, first degree vehicular homicide, making a false statement and a traffic offense. He was sentenced to a total of fifteen years with probation possible after five years.
Meanwhile, M.L.S. had been diagnosed with anxiety and needed "a consistent, structured, stable environment capable of providing support and positive reinforcement." The court determined that his mother was unable to meet those needs except for short visits. Accordingly, the court determined that the permanency plan for the child was nonreunification with the parents and placement with a willing relative. It was also determined that the paternal grandmother, who sought custody, should seek and receive training to be able to handle placement of the child. The father did not appeal this order.
A subsequent review dated November 7, 2002, found that the child "has extraordinary needs that require specialized training to adequately meet his needs. He has been diagnosed as suffering from ADHD, and it has been a struggle to find the right medicine and the right dosage. His placements have [been] disrupted several times because of his disability." The case plan remained nonreunification with the permanency plan being placement with a fit and willing relative. Also, the paternal grandparents were given a four-point action plan, which described the specific steps that they had to take in order for the child to be placed with them.
The plan required the grandparents to apply and qualify to become therapeutic foster *618 parents, to provide a physician's statement that each grandparent was capable of caring for the child, to obtain approval for their home by passing a department safety inspection and to attend therapy with the child. As of April 21, 2003, the court found that the grandmother had not taken all of the required actions. Accordingly, the court changed the permanency plan to "a planned, permanent living arrangement (long-term foster care) other than adoption, reunification, placement with a relative or legal guardianship." The court ordered that the child remain in the therapeutic foster home where the child had been thriving.
As of October 21, 2003, the father remained in prison. Following a permanency hearing on that day, the court found that the child "had progressed remarkably well" in the therapeutic foster home.
Finally, following a termination hearing held on August 9, 2004, the juvenile court terminated the parental rights of the mother and father. The court also found that the grandmother "did not follow the clear instructions of the order of November 7, 2002" and that, therefore, she was not in a position to provide care for the child's special needs. The court determined that it was in the child's best interests to remain in the therapeutic foster home.
1. The father contends that the evidence was not sufficient to support termination of his parental rights. In determining whether to terminate parental rights, courts apply a two-step analysis:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000). See also OCGA § 15-11-94(b)(4)(A).
(a) Parental Misconduct or Inability. We find that there was clear and convincing evidence to support a finding by the juvenile court of parental misconduct or inability based upon the statutory factors. Only the evidence related to the father will be presented. The mother has not appealed.
(1) Deprivation. Because the father did not appeal the juvenile court's order finding that the child was deprived, he is bound by that determination. In the Interest of B.L.S., 239 Ga.App. 771, 774, 521 S.E.2d 906 (1999).
Furthermore, Dr. Frances Hinchey, the child's licensed clinical psychologist, testified that the child had special needs: he appeared to have a learning disability attributable to "some environmental deprivation early on in his life." The child appeared to have been traumatized in his life and, when she first saw him, he was "not connected to the here and now." Dr. Christie Clure, the child's psychiatrist, evaluated the child and diagnosed him with a history of depression, attention deficit disorder, nonspecific anxiety and tricoltylomania  an impulse control disorder that involves pulling out one's own hair. He has been prescribed antidepressant, antianxiety and antipsychotic medications, as well as Ritalin for attention deficit disorder.
(2) Lack of proper parental care or control as cause of deprivation. When considering this question, the juvenile court was authorized to consider "excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors ..." to the extent that it rendered the father incapable of adequately providing for the condition and needs of the child. OCGA § 15-11-94(b)(4)(B)(ii). The court was also authorized to consider the conviction and incarceration of the father to the extent that it has had "a demonstrable negative effect on the quality of the parent-child relationship." OCGA § 15-11-94(b)(4)(B)(iii). Dr. Hinchey testified that *619 the mother reported a history of alcohol abuse by the father and marital violence, which required calling the police on at least five occasions. The father admitted drinking and that his wife was terrified of him. The father admitted that the drunk-driving accident that led to his incarceration had a negative effect on his son and his own ability to be a parent. Also, after being removed from the home and placed in therapeutic foster care the child has made "remarkable progress," according to Dr. Hinchey. The evidence was sufficient to support a finding that lack of proper parental care or control caused the child's deprivation.
(3) The cause of the deprivation is likely to continue. "[E]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required." (Citations and punctuation omitted; emphasis in original.) In the Interest of K.M., 240 Ga.App. 677, 680, 523 S.E.2d 640 (1999). "But the trial court is entitled to consider evidence of the [father's] past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future." (Citations omitted.) In the Interest of A.M., 259 Ga.App. 537, 542, 578 S.E.2d 226 (2003).
Dr. Hinchey testified that the child will continue to need psychological and psychiatric care and other counseling. Dr. Clure testified that the child is still on several medications and will probably need medication for ADHD into adulthood. She testified that it was important for the child to receive his medications on a regular basis. She opined that the child needed a highly structured, consistent, nurturing environment.
The father did not present any evidence that he had taken steps to provide such an environment. He did not present evidence that he had taken steps to control his alcohol problem, and he admitted an incident of DUI prior to the incident that led to his incarceration. With regard to the vehicular homicide, he characterized the incident as a "freak accident." He did not present any evidence that he tried to maintain a parental bond with the child in a meaningful, supportive manner. Also, it is not known whether he will be released at the end of his five-year term, and he presented no evidence that he has taken any affirmative steps to secure employment or a suitable and stable residence following release from incarceration. The father testified that if the child wanted to be placed with the foster parents on a permanent basis, "I'd get over it." Finally there is no evidence that the father has provided any support for the child. "A parent... has a statutory duty to support her children, with or without a court order. OCGA § 19-7-2." (Citation and punctuation omitted.) In the Interest of J.J., 259 Ga.App. 159, 162, 575 S.E.2d 921 (2003).
Sufficient evidence was presented to support a finding that the cause of the child's deprivation was likely to continue.
(4) Continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. Dr. Hinchey testified that stable continuity of care is important for the child and that if the court did not terminate the parent's rights it would be detrimental to him. The case manager testified that children who stay in foster care with no permanency tend to have more emotional problems, psychological problems and other problems with attachment. Courts may consider this type of information as well as the special needs of a child and the parent's inability to provide for those needs. See In the Interest of J.C.J., 207 Ga.App. 599, 602, 428 S.E.2d 643 (1993). The evidence was sufficient to support this element of the juvenile court's findings.
(b) Best Interest of the Child. The evidence presented at the hearing and discussed above supported the juvenile court's conclusion that terminating the father's parental rights was in the best interest of the child. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" In the Interest of D.L., 268 Ga.App. 360, 360-361, 601 S.E.2d 714 (2004).
*620 Also, the child told the judge and the guardian ad litem that he wanted to stay with the foster family but have visits with his mother. He would like to have telephone contact with his grandmother and supervised visits with her. He did not want any contact with his father. Dr. Hinchey testified that the child continues to need special needs therapeutic-type training. At school, he attends classes for children with emotional/behavioral disorders. The case manager testified that permanent placement was in the child's best interest. The guardian ad litem stated that, in her opinion, placement with the foster family was in the child's best interest. See also OCGA § 15-11-94(a) (court may consider children's need for a secure, stable home).
2. The father also contends that the court erred by not considering the paternal grandmother for placement after terminating the father's parental rights. However, the court did consider the grandmother for placement but found that she and the grandfather did not take the steps ordered by the court to put them in a position to provide care for the child's special needs. This Court "will not disturb a trial court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion." In the Interest of A.L.S.S., 264 Ga.App. 318, 324, 590 S.E.2d 763 (2003). The record contains evidence to support the trial court's determination that the grandparents did not proceed as directed by the court.
The grandparents have never participated in the child's psychological appointments as required in the order. The grandfather never completed the requirement for a physician's certificate. Also, although an issue was raised about whether the grandparents had initially been given proper notice of the time and the date for some of the required training, the court ordered the department to give them the information they needed to proceed. And despite clear notice in the November 7, 2002 order of the court and information from the case manager, the grandparents failed to meet the requirements. Although the grandmother contends that she was thwarted by circumstances or misinformation on some occasions from completing the required programs, it was up to the trial court to determine witness credibility. We find no abuse of discretion.
Judgment affirmed.
SMITH, P.J., and ELLINGTON, J., concur.