632 S.E.2d 433 (2006)
279 Ga. App. 643
In the Interest of K.A.S. et al., children.
No. A06A0508.
Court of Appeals of Georgia.
June 7, 2006.
*434 Jamie G. Averett, Cartersville, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Brunt & Hood, Jason P. Hood, Neel & Smith, Barry S. Haney, Joshua D. Earwood, Cartersville, for appellee.
MIKELL, Judge.
A.P., the biological mother of K.A.S., E.O.P.S., C.O.L.V.P., B.L.N.C.P., and M.C.M.P.,[1] appeals the juvenile court's order terminating her parental rights to her children[2] and awarding custody to the Bartow County Department of Family and Children Services (the "Department"). For the reasons set forth below, we affirm the termination order.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's *435 factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[3]
So viewed, the evidence shows that these five children came into the custody of the Department on January 16, 2004, after the Bartow County Juvenile Court entered an order for shelter care because the children were not receiving basic care or attending school, some of the children were in need of medical care, and their parents had a history of not cooperating with the Department. There was evidence in the record that the Pickens County and Chattooga County Departments of Family and Children Services had been involved with the family since November 2001 and had provided services to them, including money, child care, food, gas, and gifts. On January 20, 2004, the court conducted a detention hearing, concluding that there was probable cause to believe the children were deprived because "there had been multiple county DFACS involvement for neglect; home is periodically filthy; various children not getting medical needs met; home is furnished inadequately; parents having difficulty meeting basic needs; school age children have multiple tardies; [and] mother uncooperative." The court also concluded that the children were at risk with their parents who had a pattern of moving from one county to another while involved with the Department.
On February 11, 2004, the court entered a "Temporary Custody Order of Adjudication and Disposition," after the Department filed a deprivation petition on behalf of all five children. Appellant and Malcolm Piper, the legal father of B.L.N.C.P. and M.C.M.P. and putative father of C.O.L.V.P., and Clayton Shattuck, the putative father of K.A.S., consented in open court to the children being placed with the Department.[4] They also consented to the following causes of deprivation: medical neglect; inadequate/unstable housing; unstable employment; neglect/lack of supervision; and biological father's failure to legitimate. The parties also stipulated that medical testimony would have shown that on January 21, 2004, M.C.M.P. had been diagnosed with pneumonia, sinusitis, and an ear infection that had existed for several days before he was examined and that on January 16, 2004, E.O.P.S. was diagnosed with a sprained foot, and K.A.S. with an untreated ear infection. Teresa Davis, the Department case worker, testified at the hearing that E.O.P.S. stated that he sustained the sprain to his foot when his mother pushed him to the floor and that he complained to her about the pain, but she never attempted to provide medical care; that the appellant told her that E.O.P.S. had a fever of 106 degrees on December 21, 2003, and that she took him to the hospital but left before he was seen; and that when one of the Department's supervisors visited the next day, the child no longer had a fever. The parents consented to a reunification case plan, which required the appellant to complete a psychological evaluation and follow any recommendations made; obtain and maintain safe and stable housing; obtain and maintain stable, legal income; complete age appropriate parenting classes and demonstrate skills learned; establish or maintain a bond with the children by regular visitation; and address any issues of marital instability.[5]
On March 19, 2004, the court entered an order, making the February 11 order the final disposition of the court, and providing that it would expire on January 16, 2005. The court placed temporary custody of the children with the Department and approved its proposed placement of K.A.S. and E.O.P.S. with K.A.S.'s paternal grandmother. The Department filed a motion for extension of custody, which the court granted, extending the Department's custody of the children for an additional twelve months. Appellant did not appeal the provisional or final disposition orders in which the children were found deprived.
*436 On April 20, 2005, the Department filed a petition to terminate the parental rights of the appellant and the children's fathers. The juvenile court conducted hearings on the petition on July 13, August 12, August 15, and August 23, before entering its order to terminate the appellant's rights on September 2, 2005. On June 21, 2005, before the first hearing date, Grogan, the legal father of the three oldest children, surrendered his parental rights to the Department. At the hearing on July 13, Shattuck consented to the termination of his rights to his biological daughter, K.A.S., and Poole consented to the termination of his rights to his biological son, E.O.P.S. The evidence adduced at the hearing follows.
The appellant testified that she was married to Piper when the children were removed from her custody and that they were still married but had been separated since March 2004; that she lives in a mobile home with her boyfriend, Jim McDaniel; that she was five months pregnant with McDaniel's child; that she was saving money to pay for her divorce from Piper; that McDaniel pays all of her bills and has not been able to pay for her divorce because he pays child support for one of his three children; that she is entirely dependent on McDaniel except that she makes $25 weekly babysitting a child; and that she does not own a vehicle.
When asked about whether she had obtained and maintained stable legal income as required by the reunification plan, appellant admitted that she had not. Appellant testified that she had held five different jobs since her kids were removed from her custody and admitted that she could have tried to keep one of them. Regarding the requirement that she maintain safe and stable housing, appellant testified that she had lived in five different places since she lost custody of her children and that during that time, she had a house for seven months, which she lost through no fault of her own; and that she had beds for all of her kids in her current home.
When asked how she would afford to take care of her kids if they were returned to her custody, appellant testified that she would manage and that McDaniel would take care of her kids. When asked about the case plan goal that she maintain a bond with her children through regular visitation, appellant testified that most of the visits with the children went well, even though they were disobedient, and that C.O.L.V.P. did not listen to anyone because her father let her get away with everything. Appellant testified that she paid five dollars in child support while the children were in the Department's custody, acknowledging that this amount was insufficient.
Appellant completed the psychological evaluation that she was required to undergo but did not follow all of the recommendations of the therapist, specifically the suggestion that she attend group therapy. Appellant testified that she did not believe that she needed therapy and had not benefitted from that provided thus far. Appellant admitted that she may have used a racial slur against the case worker while in the children's presence. She opined that her kids were taken because she snapped at one of the social workers.
At the continuation of the hearing on August 12, 2005, appellant testified that she continued to live with McDaniel; that she had purchased beds for her children and told the boys that she had bunk beds waiting for them at home; that she had filled out her divorce petition but had not filed it; that since June, she had been earning $25 to $50 a week babysitting; that she had completed several job applications and thought that she would be hired by Pizza Hut or Murphy's Oil after having her sixth baby; that she remained dependent upon McDaniel and had no bank account or savings but would "make something work" if he left her; and that even after completing parenting classes, she still had some difficulty handling C.O.L.V.P. Appellant further testified that she is angry that her children have been removed from her custody and has occasionally "gone off" on the caseworker; that she had not paid any additional child support since the previous hearing; and that she realized that she was setting a bad example by living with one man while being married to another.
Margaret Conley, the case manager, who had been assigned to the case for 13 months, *437 testified that when she initially received the case, there were signs of medical neglect and that safe and stable housing was not being provided; that appellant had not obtained safe and stable housing for the children as she had moved seven times over the last year; that appellant had not obtained a stable legal income as she had quit three of the five jobs she had during the relevant time period and been terminated from two of them; that she was concerned about appellant's ability to care for the children since she was completely dependent upon her boyfriend; and that appellant had done nothing to address her marital instability. Conley further testified that appellant completed parenting classes in March 2005 and had begun exhibiting skills acquired therein, and consequently, the Department had been able to decrease the number of parent aides who helped with appellant's visits from three to one. However, Conley always helped with the visits because it was difficult for appellant to handle all five children at one time. Conley maintained that she was concerned about appellant's ability to provide for the children and a newborn because she sometimes lacked patience; that the children could be at risk of harm if returned to appellant's custody because she is not financially capable of taking care of them; that appellant had not paid sufficient child support; and that appellant had not followed the recommendations from her psychological evaluation.
Regarding the children, Conley testified that K.A.S. had been placed with her paternal grandmother in March 2004, who resided in Cobb County and was a potential adoptive parent, and that the grandmother's home had been approved by that county's Department of Family and Children Services; that K.A.S. preferred to live with appellant but accepted living with her grandmother; that E.O.P.S. was placed with K.A.S. and shared the same sentiment about his living situation; that C.O.L.V.P. had been placed with potential adoptive parents since January 2005; that the three younger children could not be placed together because of C.O.L.V.P.'s conduct; that B.L.N.C.P. had been placed in a potential adoptive home since June 15, 2004; and that M.C.M.P. had also been placed in a potential adoptive home since May 2004. Conley testified that the children were doing well in their current placements and were bonding with their foster families; that the children would be harmed if removed from their current placements; and that she recommended that the court terminate the appellant's and Piper's parental rights.
On August 12, 2005, Conley testified that the appellant had used a racial slur against her two weeks earlier during one of the visits; that appellant and her kids appeared to share a bond with one another; that K.A.S. has bleeding ulcers that her doctors opined were caused by stress and that she became very upset during a visit when the appellant brought the child she baby-sat to the visit; that K.A.S. did not have bleeding ulcers when she came into the Department's care; that K.A.S. would be hurt by the termination of her mother's parental rights; that Conley did not know what effect the termination would have on E.O.P.S.; that C.O.L.V.P. would be detrimentally affected if returned to her mother; that B.L.N.C.P. was doing well until the appellant told him that she had a bunk bed at home for him, at which point he yelled at his foster parents and said that he did not want to stay with them; that M.C.M.P. thinks of his foster mother as his mother and of her home as his home; and that the foster parents and care-givers allow the children to visit with each other and do things together. Conley maintained that the Department only had a certain period of time in which it was required to make a decision about the children's wellbeing and that the appellant had not demonstrated over the past 19 to 20 months that she was in a position to parent her children. Conley also testified that she remained primarily concerned with the appellant's inability to provide financial or housing stability to her children.
Dr. Andrea Bishop-Marbury testified that she treated B.L.N.C.P. for eleven months and C.O.L.V.P. and M.C.M.P. for a brief period of time; that B.L.N.C.P. refused to eat at one point and had adjustment and aggression problems, all of which he successfully conquered; that she recommended that the children be placed in separate homes *438 because they were aggressive toward each other; that children need permanency in the form of one family to love and take care of them so that they can learn to trust that their needs will be met; and that children who do not achieve permanency often develop reactive attachment disorder, which means they do not trust other people, which can cause other personality disorders.
Lea Johnston, who was employed with a company that provided parental education and conducted drug screens, testified that she had spent 71 to 72 hours with appellant teaching her parenting skills and observing her with her children; that appellant was very bitter and negative when she first met her but is now a totally different person; that appellant's temper and self-esteem have improved; that she taught appellant how to be an authority figure for her children; and that she could not give a time frame for when appellant would be ready to parent her children but that she thought that she would be able to in the future. Under cross-examination, Johnston conceded that it was problematic that appellant did not take responsibility for her role in losing custody of her children initially; that she was unaware that appellant was completely financially dependent on her boyfriend and that her financial instability was a problem; that appellant did not tell her that she was pregnant until Johnston asked her; that appellant had not made a good decision when she became pregnant in her circumstances; that it was inappropriate for appellant to make promises to the children about coming home; and that appellant's use of racial slurs did not comport with the parenting skills that she taught her.
The guardian ad litem testified that he was very concerned with K.A.S.'s health and felt that the uncertainty involved in these proceedings had contributed to the child's bleeding ulcers; that he was not convinced of the appellant's ability to parent her children despite the improvements that she had made; that he was concerned that appellant was unable to take responsibility for her actions; that she was pregnant but came into the courtroom with an open pack of cigarettes in her pocket; that she has no independent means of taking care of the children; and that even if each child begged him to allow them to return to their mother, he could not recommend that action to the court. His decision was based on the fact that appellant was not in a position to raise or care for her kids and that all of the kids were doing well in their current placements. Though the guardian ad litem thought the termination would be very difficult for E.O.P.S., he also thought that the boy would adjust and move on better now than if he were placed with appellant, who eventually might lose custody of him again.
The juvenile court entered an order terminating the appellant's parental rights on September 2, 2005, from which appellant appeals.
Before terminating parental rights, a juvenile court must employ a two-prong test.[6] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[7] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[8] The appellant raises the single enumeration of error that the Department failed to present sufficient evidence to justify the court's finding of clear and convincing evidence to terminate her parental rights, but she specifically disputes its findings as to the third and fourth factors in her brief.
*439 1. We first address the juvenile court's finding of parental misconduct and inability.
(a) The juvenile court entered an order finding that appellant's five children were deprived on February 11, 2004, and made that order the final dispositional order of the court on March 19, 2004. The appellant did not appeal either of these orders. "Therefore, [she] is bound by this finding of deprivation and the first factor is satisfied."[9]
(b) Appellant does not specifically argue that the Department failed to present clear and convincing evidence that a lack of parental care and control caused the children's deprivation. However, she does discuss at length her attempts to comply with the reunification plan. In determining whether lack of proper parental care or control caused the deprivation where the child is not in the care of the parent, the juvenile court is authorized to consider whether the parent failed, for one year or longer, "[t]o comply with a court ordered plan designed to reunite the child with the parent."[10] Therefore, we will construe appellant's arguments as a challenge to the juvenile court's finding on the second factor.
Here, the evidence shows that the mother complied with some of the reunification case plan requirements. However, she never managed to obtain stable, legal income or stable housing, notwithstanding the fact that she had almost two years in which to meet these goals. She testified that she and her boyfriend moved into their own place three weeks before the hearing but acknowledges that she is entirely dependent upon him and would not be able to maintain the housing if their relationship terminated. Regarding her inability to maintain an income, she testified that she had five jobs during the relevant time period and admitted that she could have tried to keep one of those jobs to support herself.
While appellant's efforts to comply with the case plan and improve herself are laudable, the juvenile court, not this court, determines whether a parent's conduct warrants hope of rehabilitation,[11] and it also judges the credibility of appellant's good intentions.[12] The appellant in the case sub judice failed to complete two of the most important goals of her case plan, to obtain and maintain a stable, legal income and housing, as well as other goals, i.e., address marital instability and follow the psychologist's recommendations. Additionally, at the February 11 hearing, appellant conceded that the children were deprived due to medical neglect and several other factors. Accordingly, the juvenile court was authorized to find by clear and convincing evidence that the mother's lack of parental care was the cause of the deprivation.[13]
(c) "[I]n determining whether the children's deprivation is likely to continue, the juvenile court may consider the parent's past conduct. Furthermore, the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[14] Here, the evidence supports the trial court's finding that the deprivation is likely to continue.[15]
Appellant's past employment history does not evidence a desire on her part to provide for her children. She had five jobs over the course of almost two years, three of which she decided to quit. She acknowledged that she could have made more of an effort to keep one of the jobs; she simply did not. Except for a babysitting job that pays $25 per week, appellant is totally dependent upon her live-in boyfriend for financial support and a stable home environment. Though she promises that she will get a job after she has *440 her sixth child, there is no independent evidence in the record that she has been offered future employment. Appellant has paid a total of five dollars in child support to the Department. Finally, she refuses to attend the group counseling that has been recommended and takes no responsibility for the causes of the children's deprivation.
Appellant cites Chancey v. Dept. of Human Resources,[16] for the proposition that the fact that a parent is unemployed and has no employment prospects or stable living arrangements, alone, does not warrant termination of that parent's rights.[17] However, Chancey is distinguishable from the case sub judice because in that case, the child lived in foster care her entire life and there was no evidence that the appellant had ever engaged in misconduct detrimental to her child or any other child or that she suffered from a mental or physical condition that rendered her incapable of caring for a child.[18] In this case, there was evidence that the children's medical needs were neglected and that appellant was unable to provide and care for her children. Appellant also cites In the Interest of M.M.,[19] for the proposition that her dependency on McDaniel does not justify the termination of her parental rights. However, appellant neglects to mention that in that case the mother met most of the goals of her reunification plan and there was no evidence that the causes of the deprivation were likely to continue.[20] In this case, appellant did not meet most of the goals of her case plan and consequently, the causes of the deprivation are likely to continue.
(d) We have recognized that the same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm.[21] As additional evidence in support of this factor, there was medical testimony that children need permanency so that they can trust that their needs will be met and that the lack of permanency can lead to personality disorders. The juvenile court was permitted to consider this type of information in reaching its findings.[22] In fact, this court has held that "[c]hildren need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[23] Thus, even though there was some testimony that if given an additional unspecified period of time, appellant would be capable of parenting her children, the fourth factor in determining parental misconduct or inability was satisfied.
2. Finally, the juvenile court was authorized to conclude that the termination of the mother's parental rights was in the children's best interests. In reaching this conclusion, the court could consider the same factors that supported its finding of parental inability.[24] Based on the evidence discussed above, including the successful placement of the children in foster care, any rational trier of fact could have concluded that termination of parental rights was in the best interests of the children.
Judgment affirmed.
BLACKBURN, P.J., and ADAMS, J., concur.
NOTES
[1] The children are ten, eight, six, five, and three years old, respectively.
[2] The order also terminates the rights of the children's biological, putative, and legal fathers, but they are not parties to this appeal.
[3] (Footnotes omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001).
[4] The court noted that Wayne Grogan, the legal father of the three older children, and Michael Poole, the biological father of E.O.P.S., were not present because their whereabouts were unknown.
[5] The reunification plan also included goals for Piper, which are not pertinent here since he is not appealing the termination of his rights.
[6] OCGA § 15-11-94(a); In the Interest of C.F., 251 Ga.App. 708, 711, 555 S.E.2d 81 (2001).
[7] OCGA § 15-11-94(b)(4)(A) (i)-(iv); In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
[8] (Citation omitted.) In the Interest of S.B., 237 Ga.App. 692, 693, 515 S.E.2d 209 (1999). Accord In the Interest of R.N., supra.
[9] (Citations omitted.) In the Interest of E.C., 225 Ga.App. 12, 15, 482 S.E.2d 522 (1997).
[10] OCGA § 15-11-94(b)(4)(C)(iii).
[11] In the Interest of B.J.F., 276 Ga.App. 437, 441(1)(b), 623 S.E.2d 547 (2005).
[12] In the Interest of R.N., supra at 205(2), 480 S.E.2d 243.
[13] Id.
[14] (Punctuation and footnotes omitted.) In the Interest of F.C., supra at 678(1), 549 S.E.2d 125. See also In the Interest of C.W.D., 232 Ga.App. 200, 204(1), 501 S.E.2d 232 (1998).
[15] See In the Interest of F.C., supra.
[16] 156 Ga.App. 338, 274 S.E.2d 728 (1980).
[17] Id. at 340(1), 274 S.E.2d 728.
[18] Id. at 338, 340(1), 274 S.E.2d 728.
[19] 263 Ga.App. 353, 587 S.E.2d 825 (2003).
[20] Id. at 355-359(1), 587 S.E.2d 825.
[21] See In the Interest of J.K., 278 Ga.App. 564, 567-571(2, 3), 629 S.E.2d 529 (2006); In the Interest of M.J.T., 255 Ga.App. 553, 556, 565 S.E.2d 877 (2002); In the Interest of K.L., 234 Ga.App. 719, 722, 507 S.E.2d 542 (1998).
[22] See In the Interest of M.L.S., 273 Ga.App. 554, 558(1)(a)(4), 615 S.E.2d 615 (2005).
[23] (Punctuation and footnote omitted.) In the Interest of F.C., supra.
[24] In the Interest of M.V., 253 Ga.App. 669, 672, 560 S.E.2d 125 (2002). Accord In the Interest of D.B., 257 Ga.App. 497, 499(2), 572 S.E.2d 9 (2002).