691 S.E.2d 402 (2010)
In the Interest of A.R. et al., children.
No. A10A0125.
Court of Appeals of Georgia.
March 8, 2010.
*403 Edward J. Peterson, for Appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Thomas J. O'Donnell, Kathryn A. Fox, Asst. Attys. Gen., Mahaffey & Dube, Christopher N. Dube, for Appellee.
BLACKBURN, Presiding Judge.
The natural mother of A.R., V.R., and S.R. appeals from an order of the juvenile court terminating her parental rights to the children, arguing that the juvenile court lacked clear and convincing evidence to support its findings of parental misconduct and inability and that termination of the mother's parental rights was in the children's best interests. Discerning no error, we affirm.
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.
(Punctuation omitted.) In the Interest of P.D.W.[1]
So viewed, the record shows that the Washington County Department of Family and Children Services ("the Department") became involved with the family in January 2005, because of evidence that the mother was neglecting the children. At that time, A.R., V.R., and S.R. were eight, six, and five years old, respectively. On October 31, 2005, the Department obtained an emergency order allowing it to take the children into care, based on the fact that the family was without gas or electricity; that the mother lacked the financial means to correct the situation; that S.R., who is severely autistic, had been sent to school with wet and soiled clothing; and that A.R. and S.R. had been observed playing near a busy city street without adult supervision.
On November 8, 2005, the Department filed a deprivation petition, alleging that the children were neglected, that the father had abandoned them several years earlier and his whereabouts were unknown, and that the mother lacked the financial means to support them. Following a hearing, the juvenile court found the children to be deprived and awarded temporary custody of them to the Department. At that time, A.R. and V.R. were placed together in a foster home and S.R. was placed in a separate foster home, with a family trained to assist with her special needs. After another hearing in February 2006, the juvenile court approved a permanency plan that called for reunification with the mother, concurrent with adoption. As a condition of reunification, the mother was required to obtain and maintain a source of income and support for the children and *404 obtain and maintain stable and appropriate housing. In a supplemental order entered on August 16, 2006, the juvenile court stated that the mother's obtaining and maintaining employment was an "essential" element of the reunification plan.
In October 2006, the Department moved for an extension of custody, noting that the mother had met many of her case plan goals,[2] but asserting that she needed to complete additional parenting classes to learn how to address S.R.'s special needs. The juvenile court granted that motion and extended the Department's custody for an additional 12 months.
The mother moved for judicial review of the case in February 2007, requesting that the juvenile court vacate or modify its previous order and return custody of the children to her. The juvenile court held a hearing on that motion and denied the same, noting that, following a psychological assessment of the mother, the Department was concerned that she lacked the mental capacity to parent the children. In its order, however, the juvenile court required the Department to verify the mother's housing and income and to conduct a background check of her boyfriend.
Following a scheduled judicial review in March 2007, the juvenile court ordered the Department to begin transitional visits with the mother for A.R. and V.R., each weekend for the remainder of the school year, and noted "[i]f those visits go as planned, [A.R. and V.R.] will be placed back with the mother after a review by this court on the mother's progress."
In August 2007, the mother filed another motion for judicial review of the case, requesting that custody of the children be returned to her. In preparation for the hearing on that motion, the Department filed the written report of the court-appointed special advocate ("CASA"), dated September 12, 2007. That report stated, in part:
These children have been in foster care since October 2005! The Department has provided innumerable services to this family, to the point that it has been reported that there is no additional funding available. [The mother] has had extensive in-home parenting [and] budgeting [instruction], participated in [a program] in an effort to train her for an appropriate job, and continues with current in-home visits by Georgia Psychological [Services] which include additional training in budgeting and parenting. These services have been in place for almost two years.... [The children's] lives have been in limbo for long enough. [They] deserve a home where they feel safe and loved, where their needs are consistently met, and where they can blossom into well-adjusted young people. They do not need to assume the role of caregiver or parent, which has been the case for [A.R.] in particular. She consistently feels the need to take care of her mother and, at the age of 10, this is not her job.... The court has a difficult decision; however, it is CASA's recommendation that we move toward termination of parental rights unless [the mother] is willing to voluntarily surrender her rights, as she previously discussed with [A.R. and V.R.'s foster mother]. The best situation would be to find an adoptive placement that could accommodate all three children, including [S.R.], and one that would allow [the mother] to continue to be a participant in the lives of these children.
On September 26, 2007, after receiving a citizen review panel's report on the case, the juvenile court entered an order continuing custody of the children with the Department and noting that the Department did intend to petition for termination of parental rights. Shortly thereafter, the Department filed a petition for a permanency hearing, in which it stated that it wished to amend the permanency plan to reflect nonreunification with the mother, concurrent with adoption. Sometime after the filing of this petition, the mother voluntarily surrendered her parental rights to A.R. and V.R., in favor of their then foster parents. She subsequently revoked that surrender of rights, claiming she had been misled into signing the same.
*405 The Department filed a petition for termination of parental rights on May 28, 2008, and the juvenile court held a two-day hearing on the same in October and November 2008. In preparation for that hearing, the Department filed a second written CASA report, dated October 22, 2008. That report stated, in part:
This is an extremely difficult and complicated case that has continued for much too long. [The Department] has been in and out of this home for [approximately] 7 years. [The mother] believes she can raise her children simply because she loves them and believes in God.... [H]owever, based on observations and the psychological [assessment] it does not appear that [the mother] can effectively parent her children without continued assistance and input. This is supported by a recent conversation with [V.R.,] who told this CASA that she does not believe her mother can take care of her.... It is time for permanency in these girls' lives; they need to know they belong to a family who will love them, care for them, nurture them, and help them grow into healthy, productive citizens.
The evidence at the termination hearing showed that all three children had been residing in the same foster home since August 2008 and that the children were thriving in that placement. The foster parents wished to adopt all three children, but were willing to allow them to maintain regular contact with the mother.
The testimony of the mother and the witnesses called on her behalf showed that she had obtained adequate and stable income and housing only by moving in with her boyfriend of approximately two years. The mother, however could not marry the boyfriend, because she was still married to the children's father. She had made no independent effort to locate the father, either for the purpose of obtaining a divorce or obtaining child support. Furthermore, the mother explained that even if she was divorced, she was not sure she would want to marry the boyfriend.
The mother and the boyfriend lived in government-subsidized housing, but the apartment was solely in the boyfriend's name and he paid the rent, the utilities, and other bills. The couple supplemented the boyfriend's income with food stamps. The mother had, with the assistance of the Department, recently re-applied for SSI disability benefits, having been initially denied the same. Since the birth of A.R. approximately 11 years earlier, the mother had worked briefly at one part-time job. Specifically, the record showed that after moving in with her boyfriend, she was employed part-time picking up garbage around the apartment complex, for which she was paid approximately $200 per month. The mother explained to the CASA that she quit that job, however, because "it [was] too hot outside and my back hurt[ ]." The mother's only other attempt at obtaining employment was to inquire whether there was a job opening at a local pizza restaurant. (The pizza restaurant was not accepting applications at that time.) The mother explained that she thought her inability to obtain a job resulted from her lack of education and her bad "dental work"; she apparently saw no connection between her lack of employment and her failure to actively seek the same.
The psychologist who evaluated the mother testified that she had limited intellectual capacity and "limited ability to apply information or to achieve independent functioning." In other words, regardless of the number of parenting classes she took or skills she was taught, the psychologist did not believe that the mother would be able to apply that information to allow her to properly parent her children. According to the psychologist, the mother would need daily help to assist her with parenting and, even with such help, she could not hold a job and parent her children. The psychologist further testified that he had also evaluated the mother's boyfriend, and he was not capable of providing the mother with the necessary parenting assistance.
The counselor who completed the comprehensive child and family assessment also opined that the mother could not parent the children herself. It was her belief that if the children were returned to the mother, they would be neglected, unless the mother was provided with assistance. The counselor concurred in the psychologist's opinion that the *406 boyfriend was not the person to provide the mother with such assistance.
The Department case manager similarly testified that she did not believe the mother could parent the children appropriately, because she lacked the necessary judgment and the ability to make the day-to-day decisions required of a parent. She also noted that the mother had not been able to achieve either stable housing or stable income independently; rather, she had achieved those only by moving in with her boyfriend. Moreover, despite this alleged stability, the mother had been unable to pay the Department the amount of child support she had been ordered to pay, which was $255 per month. Instead, she had only paid approximately $25 per month during the three years the children were in Department custody. In light of these facts, the case worker felt that if the children were returned to the mother, there was a "high possibility that they would come back in[to] our care."
When asked how she would provide for the children if her boyfriend were unavailable or unwilling, the mother responded "I really don't know." Pressed as to what steps she would take to provide for the children, the mother could name none, merely stating that she "would do the best I could," and "I don't know [anything] about the future, but, you know, that's what God is there for." When asked what assurances she could offer the court that, if returned to her, the children would not be back in the Department's care within two to three months, the mother stated, "I don't think [anybody] can have that kind of assurance." She did assure the court, however, that if she could not provide the children with basic necessities she would voluntarily surrender custody of them to the Department.
The mother acknowledged that she would require daily assistance to parent the children, but when asked to identify for the court who would provide such assistance, she responded "God." Upon further questioning, the mother was able to name one friend who she testified "said I can call on her any time." Additionally, A.R. and V.R.'s former foster mother and foster grandmother testified that they could "look in" on the mother and children and would be available for the mother to call.
Following the hearing, the juvenile court entered an order terminating the parental rights of both parents. After her motion for a new hearing was denied, the mother filed an application for a discretionary appeal, which this Court granted. This appeal followed.[3]
A juvenile court's termination of parental rights is a two-step process. Applying the criteria set forth in OCGA § 15-11-94(b), the juvenile court must first determine whether there is clear and convincing evidence of parental misconduct or inability. See OCGA § 15-11-94(a). If it finds such misconduct or inability, the court then determines "whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home." (Punctuation omitted.) In the Interest of J. J.[4]
1. The Department demonstrates parental misconduct or inability by proving: (i) that the child is "deprived," as that term is defined in OCGA § 15-11-2; (ii) that the deprivation results from a lack of proper parental care or control of the child; (iii) that the cause of the deprivation is likely to continue or unlikely to be remedied; and (iv) that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A). "[A]lthough the four criteria are separately listed, often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria." P.D.W., supra, 296 Ga.App. at 191(1), 674 S.E.2d 338.
(a) Deprivation. The juvenile court concluded that the children were deprived because they lacked the proper parental care necessary for their physical, mental, and *407 emotional health.[5] See OCGA § 15-11-2(8)(A). This conclusion was based upon the juvenile court's findings that (i) the mother had failed to achieve her case plan goals of obtaining adequate and stable income and housing; (ii) the mother's diagnosed and observed mental limitations prevented her from making good parenting decisions on a consistent basis or otherwise parenting the children adequately; and (iii) the mother had failed to pay the ordered child support during the time the children were in the Department's custody. On appeal, the mother has not challenged the finding that the children were deprived.
(b) Cause of the deprivation. The juvenile court found that the parents were the cause of the children's deprivation, noting "[n]o other cause was suggested, and all evidence related to the parents' misconduct, their failure to remedy even the most basic problems, and their inability to do so." Again, the mother does not challenge this finding.
(c) Cause of the deprivation is likely to continue. Citing the testimony of the psychologist who evaluated her, the mother argues that the evidence did not support the juvenile court's conclusion that the cause of the children's deprivation was likely to continue. Specifically, the mother claims that the psychologist's testimony established that she was capable of parenting the children on a day-to-day basis, with "minimal oversight." This argument, however, both misrepresents the psychologist's testimony and ignores the other evidence of record that supported the juvenile court's finding as to this factor.
The psychologist testified that he had evaluated the mother approximately 18 months earlier and, based on what he saw at the time, he agreed with the Department's decision to remove the children from the home. He also stated that, looking at her scores, the mother had the "intellectual capacity" to learn the things she needed to be an adequate parent. He nevertheless voiced significant concerns about her ability to apply the things she was taught, and refused to express an opinion as to whether the children should be returned to her, insisting that the court should rely on the opinions of the Department caseworkers and others who had interacted with the mother more recently and/or more regularly. According to the psychologist, those people would be able to give an opinion as to whether the mother was "able to utilize [her] theoretical ability" to parent and whether "she [had] really come around in terms of understanding what her responsibility is [as a parent] and so forth." As explained supra, the Department case manager, the counselor, and the CASA each opined that, because of her mental limitations, the mother could not parent the children effectively.
This assessment of the mother's inability to parent was supported by the mother's own testimony. Specifically, the mother testified that she did not want her parental rights terminated because she did not think it was fair to her, "because I'm their mom." The mother also wanted the children returned to her despite the fact that she could offer the court no assurances that, if it granted her request, the children would not be returned to the Department's care within a matter of months. These responses indicate that, rather than being focused on the needs of her children, the mother was focused solely on her own wants and feelings. Similarly, the fact that the mother saw no connection between her unemployment and her failure to actively seek work also supported the conclusion that the mother lacked the ability to apply any parenting skills she was taught.
Taken together, the evidence before the juvenile court supported the conclusion that the children's deprivation was likely to continue, because the mother's mental issues impaired her judgment to the point that she was incapable of parenting. In the Interest of J.L.S.[6] See also In the Interest of A.W.[7] *408 ("[a] parent's inability to remedy the cause of the deprivation is a good predictor that the deprivation will continue into the future"); OCGA § 15-11-94(b)(4)(B)(i) (in determining whether a child is without proper parental care and control, the juvenile court must consider any "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the ... needs of the child").
Moreover, the mother's argument ignores the other evidence showing that the children's deprivation was likely to continue if they were returned to her care. That evidence included the mother's failure to achieve two of her most important case plan goalsto obtain stable housing and stable income. As the juvenile court noted, both the mother's income and her housing were completely dependent upon her relationship with her boyfriend. As such, they could not be considered stable. See P.D.W., supra, 296 Ga.App. at 193(1)(a), 674 S.E.2d 338; In the Interest of B.A.[8]; In the Interest of K.A.S.[9] Additionally, the fact that the mother has made no real effort to obtain or maintain employment "d[id] not evidence a desire on her part to provide for her children." K.A.S., supra, 279 Ga.App. at 650(1)(c), 632 S.E.2d 433. Indeed, the mother failed to maintain employment despite the fact that she had been ordered to pay approximately $255 per month in child support. Instead, she chose to rely solely on her boyfriend's income, which allowed her to pay only approximately $25 per month in support. A "[mother's] failure to support [her] child, even in the absence of an order directing the [mother] to pay a specific amount for the child's support, is compelling evidence that the [mother] is not an able parent." In the Interest of T.B.[10] See also OCGA § 15-11-94(b)(4)(C) (in cases in which the child is not in parental custody, the juvenile court must consider whether the parent has failed, for more than a year, to comply with a court-ordered reunification plan and to pay child support).
Finally, and perhaps most importantly, we note that even when construed in her favor, the testimony of the psychologist and the witnesses called to testify on the mother's behalf shows that the mother could parent the children only with some type of assistance. (Indeed, the mother's enumeration of error concedes this much.) "The test in determining termination of parental rights[, however,] is whether the mother, ultimately standing alone, is capable of mastering and utilizing the necessary skills to meet her parenting obligations." (Punctuation omitted; emphasis in original.) In the Interest of D.P.[11] (holding that mother's inability to parent children independently supported conclusion that deprivation was likely to continue). See also In the Interest of H.F.G.[12] (affirming termination of parental rights where mother had completed most of her case plan goals and maintained a bond with her child, but "the evidence show[ed] that she lacks the mental capacity to care for [her child] without around-the-clock assistance from others, something [the Department] is not obligated to provide").
"Here, [the evidence showed that] despite her good intentions, the mother has never successfully parented [the children] alone, and ... there was more than clear and convincing evidence that the mother is simply not capable of fulfilling [her parenting] obligations." (Citation and punctuation omitted.) In the Interest of O.M.J.[13] Thus, "[t]he court was entitled to infer from the evidence that, despite the best efforts of [the Department] and many other[s] ..., the same pattern of deprivation would continue if the *409 children were reunited with their mother." (Punctuation omitted.) In Interest of S.J.C.[14]
(d) Likelihood of harm. The mother argues that, even if the Department proved the other factors, it failed to present any evidence that the children would suffer harm if they were returned to her. This argument, however, is contravened both by the record and by relevant case law.
This [fourth] criterion [for the termination of parental rights] is most often a syllogism. Since "deprivation" by definition usually means that the child lacks the parental care or control necessary "for the child's physical, mental, or emotional health or morals" (OCGA § 15-11-2(8)(A)), then the continuation of that deprivation will likely cause "serious physical, mental, emotional, or moral harm to the child."
P.D.W., supra, 296 Ga.App. at 195(1)(d), 674 S.E.2d 338. Accordingly, "[w]e have recognized that the same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm." K.A.S., supra, 279 Ga.App. at 651(1)(d), 632 S.E.2d 433. Given the mother's failure to address the most significant requirements of her case plan and the evidence showing that her mental limitations prevented her from properly parenting the children, "the evidence was sufficient to demonstrate that the children's continued deprivation will cause or will likely cause the children serious physical, mental, emotional, or moral harm." (Punctuation omitted.) P.D.W., supra, 296 Ga.App. at 196(1)(d), 674 S.E.2d 338.
"Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Punctuation omitted.) P.D.W., supra, 296 Ga.App. at 196(1)(d), 674 S.E.2d 338 Here, the Department case manager testified that she believed returning the children to the mother's care would cause them harm, given the "high possibility" that they would eventually be returned to the Department's custody. The case manager's sentiments were echoed by the CASA, in two written reports filed with the juvenile court. And, the mother herself testified that she could offer no assurances that, if they were returned to her, the children would not come back into the Department's custody soon thereafter. In light of this evidence, the Department established the fourth factor in determining parental misconduct or inability. See D.P., supra, 287 Ga.App. at 174(1)(d), 651 S.E.2d 110 (even though evidence established that mother had "a true bond with her child..., the juvenile court was authorized to consider the child's need for a stable home situation and the detrimental effects of prolonged foster care" in determining whether child would suffer harm if returned to the mother) (punctuation omitted).
2. The mother further argues that, when read as a whole, the record shows that the juvenile court's termination of her parental rights violated Georgia law, because it was based on the mother's relative poverty and the fact that she could not provide her children the same kind of life the foster parents could. See In the Interest of C.T.[15] ("although the mother may struggle financially and indeed may need assistance in the care of her children, the mere fact that she earns little money and lives in a modest home does not constitute clear and convincing evidence that the mother is unfit and that the children's deprivation is likely to continue"). This argument is without merit.
As the foregoing discussion demonstrates, the juvenile court's findings with respect to termination were not based on the mother's financial situation. Rather, they were based on the mother's mental limitations (which prevented her from properly and effectively parenting her children); her failure to achieve the two most important goals of her case plan (to obtain and maintain stable housing and income); and the fact that the mother admitted that she could offer the court no assurances about the children's welfare if they were returned to her.
*410 3. The mother asserts that the juvenile court erred in finding that termination of parental rights was in the best interests of the children because, in doing so, the court ignored both the evidence showing that the children and the mother shared a true bond and the recommendations of the guardian ad litem, that A.R. and V.R. (but not S.R.) be returned to the mother.
"To determine whether termination of parental rights is in the best interest of the child, the court shall consider the physical, mental, emotional, and moral condition and needs of the child, including his or her need for a secure and stable home." (Punctuation omitted; emphasis supplied.) In the Interest of D.B.C.[16] In making this determination, "[a] juvenile court has broad discretion..., and we will not reverse in the absence of manifest abuse of that discretion." (Punctuation omitted.) D.P., supra, 287 Ga. App. at 174(2), 651 S.E.2d 110.
When ascertaining the best interests of the child, the juvenile court may "consider the same factors that supported its finding of parental inability." K.A.S., supra, 279 Ga. App. at 652(2), 632 S.E.2d 433. As discussed supra, the evidence as to these factors showed that
as of the time of the hearing and for the foreseeable future, the ... mother is unable to furnish proper parental care and control necessary for the child[ren]'s physical, mental and emotional health and that these conditions and causes of deprivation are likely to continue for the foreseeable future.... Given [the mother's] mental capacity, her inability to care for [the children] by herself, and the fact that the child[ren]'s foster parents wish to adopt [them], the juvenile court did not abuse its discretion in finding that termination of [the mother's] parental rights serves the best interests of the child[ren].
(Punctuation omitted.) H.F.G., supra, 281 Ga.App. at 27(1), 635 S.E.2d 338.
For the reasons set forth above, we affirm the order of the trial court terminating the mother's parental rights to A.R., V.R., and S.R.
Judgment affirmed.
BARNES and BERNES, JJ., concur.
NOTES
[1] In the Interest of P.D.W., 296 Ga.App. 189, 190(1), 674 S.E.2d 338 (2009).
[2] Those goals included completing drug treatment, completing parenting classes, and obtaining employment.
[3] The father is not a party to this appeal.
[4] In the Interest of J.J., 259 Ga.App. 159, 161, 575 S.E.2d 921 (2003).
[5] In this regard we note that where, as here, the children have been removed from parental custody, the Department may prove current deprivation in the termination proceedings "by showing that, if the child[ren] were returned to the parents at the time of the hearing, [they] would be deprived." P.D.W., supra, 296 Ga.App. at 192(1)(a), 674 S.E.2d 338.
[6] In the Interest of J.L.S., 293 Ga.App. 665, 670(3), 667 S.E.2d 876 (2008).
[7] In the Interest of A.W., 264 Ga.App. 705, 706(1), 592 S.E.2d 177 (2003).
[8] In the Interest of B.A., 291 Ga.App. 762, 765(1), 662 S.E.2d 846 (2008).
[9] In the Interest of K.A.S., 279 Ga.App. 643, 650(1)(b), 632 S.E.2d 433 (2006).
[10] In the Interest of T.B., 267 Ga.App. 484, 486-487(1), 600 S.E.2d 432 (2004).
[11] In the Interest of D.P., 287 Ga.App. 168, 173(1)(c), 651 S.E.2d 110 (2007).
[12] In the Interest of H.F.G., 281 Ga.App. 22, 26(1), 635 S.E.2d 338 (2006).
[13] In the Interest of O.M.J., 297 Ga.App. 20, 26-27(2)(b), 676 S.E.2d 421 (2009).
[14] In Interest of S.J.C., 234 Ga.App. 491, 493(1), 507 S.E.2d 226 (1998).
[15] In the Interest of C.T., 286 Ga.App. 186, 190, 648 S.E.2d 708 (2007).
[16] In the Interest of D.B.C., 292 Ga.App. 487, 497(2), 664 S.E.2d 848 (2008).