611 S.E.2d 713 (2005)
272 Ga. App. 45
In the Interest of K.N., a child.
No. A04A1820.
Court of Appeals of Georgia.
March 8, 2005.
*714 William Newton III, Rome, for Appellant.
Thurbert Baker, Attorney General, William Joy, Shalen Nelson, Senior Assistant Attorneys General, Laura Hyman, Assistant Attorney General, Holly Bradfield, Rome, for Appellee.
ADAMS, Judge.
The mother of K.N. appeals from the juvenile court's order terminating her parental rights. We affirm.
In considering the mother's appeal, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the mother's right to custody should have been terminated. We neither weigh the evidence nor determine the credibility of any witnesses, but instead defer to the juvenile court's findings of fact. In the Interest of J.G.J.P., 268 Ga.App. 614, 602 S.E.2d 320 (2004).
Viewed in that light, the record shows that K.N. was taken into protective custody on December 2, 2001, when he was three days old and still at the Floyd Medical Center with his mother. K.N. was removed from the mother because of her HIV status and history of not caring for her own medical needs as well as the mother's perceived inability to care for the child due to her low mental functioning. At the time, the mother's three other children were in the custody of the Polk County Department of Family and Children Services, who had reported that she was not cooperating with her court-ordered case plan. In addition, authorities had received reports of domestic violence between the mother and her boyfriend, who also was K.N.'s putative father.
The juvenile court subsequently granted the Floyd County Department of Family and Children Services ("DFACS") temporary legal custody of K.N. in an Order for Shelter Care based upon the reports of domestic violence, the mother's "low I.Q." and her failure to cooperate with the Polk County case plan relating to her other three children. And the court subsequently entered an order of deprivation with regard to K.N. on March 26, 2002, based upon the economic instability of the home, domestic violence, poor parenting skills of the parent, and the father's failure to provide custody, control or support for the child, which order was not appealed.
DFACS filed a petition to terminate the mother's parental rights to K.N. on April 24, 2003, and the hearing on the matter was held in August of that year. Stephanie Martin, the DFACS case manager assigned to K.N.'s case in April 2002, testified that she understood that the child had come into DFACS custody due to the mother's instability with regard to her three older children and her inability to care for K.N. in light of his possible HIV status, her mental health needs, and the domestic violence. And she explained that since K.N. had been in DFACS care, he had developed additional medical problems that were more serious than the HIV alone.
*715 Martin testified that the mother's case plans required her to: (1) cooperate with DFACS; (2) maintain a parent-child bond with K.N.; (3) maintain stable employment; (4) maintain a stable home; (5) ensure that her emotional health needs were met; and (6) ensure that her medical health needs were met. With regard to the parent-child bond, the case manager testified that visitation was originally scheduled at the DFACS office in Rome on a weekly basis. The mother provided her own transportation. Out of 84 scheduled visits, the mother made only 36 of them. Seven of the visits were missed because the child was sick or DFACS was unable to facilitate the visit. And although DFACS made efforts to accommodate the mother's work schedule, the remaining 41 visits were missed because the mother failed to attend. DFACS subsequently arranged through an outside provider for visitation and wraparound services, under which the provider would retrieve the child from his foster home in Gordon County and take him to his mother's home in Polk County for visits. Those services began in July 2003, one month before the hearing and the mother had attended two of these visits.
Martin further testified that she had concerns about the quality of the visits attended by the mother. She observed that on several occasions, the child appeared terrified to be left alone with the mother or the putative father. He would cry when dropped off by his foster mother, and would not willingly go to either of his parents, despite being prompted to do so. Beginning in January or February 2003, Martin observed that K.N. would cling to her or the DFACS intern and would scream "at the top of his lungs" "almost every time" they left the room, leaving him alone with a parent. In contrast, she has observed that K.N. appears very calm and playful when he is around his foster mother and appears very attached to her.
Martin testified that she had referred the mother to parenting classes four times, most recently in June 2003, but the mother never demonstrated that she had attended any of these classes or that she had completed any such course. At the hearing, however, her attorney presented evidence that the mother had completed a six-week parenting course from the United Methodist Children's Home, which was not one of the providers recommended by DFACS.
Martin testified that the mother had not met her case plan goal regarding her emotional health. Although Martin had made six referrals and set up a number of appointments for the mother, she did not begin her weekly therapy sessions until March 24, 2003, over fifteen months after K.N. was removed from her care. DFACS made a special payment arrangement for the mother's therapy, which allowed her to pay only $5 per session, with DFACS assuming the rest of the cost. But in a letter to the case manager, the mother's psychologist reported she had attended only seven out of fourteen scheduled sessions as of the date of the hearing, and thus had not completed her therapy.
The mother also failed to complete the case plan goal addressing her medical health needs. Martin said that she had discussed with the mother the importance of continuing her HIV treatment and following her doctor's recommendations. But the mother had not provided documentation showing that she was visiting her doctor or that she was in compliance. Martin had also referred the mother to the Polk County Health Department and to Universal Precaution classes to help keep herself healthy and to learn how to prevent the spread of the virus, but the mother never took advantage of these resources.
In connection with the case plan goal of maintaining stable employment and housing, Martin testified that she had been able to confirm through conversations with the mother's employer that the mother had been working at a nursing home from the time she began handling K.N.'s case, although the mother had never provided a paycheck stub or any other verification of this job. But the mother had recently lost her job. At the time K.N. was taken into DFACS custody, the mother lived in Floyd County, but a short time later moved to Polk County in violation of the juvenile court's order that she obtain written permission before moving from the county. Subsequently, the mother *716 lived in Cedartown for one year, from May 2002 to May 2003, and then moved to Rockmart.
Martin also stated that during the period she served as case manager for K.N., neither the mother nor the putative father had provided any financial support for K.N., even though they were both referred to child support enforcement when the child was placed in DFACS custody. The caseworker could not say, however, whether the enforcement division had ever contacted the mother about paying child support.
Susan Nichols, K.N.'s foster mother, testified that K.N. had been placed in her home when he was seven days old, and at the time of the hearing was twenty months old. Nichols described the child's special needs, noting first that he had been exposed to HIV when he came to them, presumably through the mother. K.N. originally required testing every six months, but after one of his tests registered positive, he had to attend the clinic every three months. Although K.N. recently had a negative test and no longer required daily HIV medication, his doctors ordered that he continue to be tested until he is two years old. If all his tests remain negative, he could be pronounced "clean." In the meantime, Nichols said that she had to treat K.N. as if he were positive: sterilizing his eating utensils and any toys he put in his mouth, wearing gloves when tending to any cuts he receives, and watching him all the time to ensure he does not bite any of the other five children in their home, especially while he was teething.
K.N. also has a severe reflux problem, which required a special diet and around-the-clock breathing treatments to prevent him from getting bronchitis. K.N. also suffered from seasonal allergies and was allergic to cow's milk. At the time of the hearing, the child took a steroid twice per day to keep the swelling in his lungs down and another medication to open his windpipe. K.N. also took two additional medications two to four times per day to keep the reflux down. In addition, K.N. suffers from tracheomalacia, a deformity of the trachea, which complicates his reflux problems, and can lead to colds, bronchitis, and sometimes pneumonia. Nichols said that she had to listen carefully to detect the difference between the child's normal wheezing from his tracheomalacia, and wheezing from a more serious problem. K.N. contracted pneumonia several times when he was younger, which required hospitalization. K.N. goes to a specialist every six months for his tracheomalacia and another specialist every four to six months for his reflux problem. These doctors monitor these disorders and adjust his medication for growth.
K.N. has also been diagnosed with cerebral palsy, which Nichols first detected because some of her other foster children also suffered from the disorder. As a result, K.N. must perform stretching exercises at home two times per day and attend weekly therapy sessions with a physical therapist and an occupational therapist. Eventually, he will need speech therapy and leg braces to help him walk, which will require regular visits to monitor the braces. Nichols also testified that K.N. has a hearing problem, which required continued monitoring and testing every three months. In addition, K.N. has to go to Women, Infants and Children Program (WIC) appointments every two months.
Nichols said that she kept a chart to keep track of K.N.'s doctor's appointments and medications. Because some of her other children also had special needs, she had to maintain a very organized, structured schedule to help the children feel emotionally secure. Nichols said that without this structure, K.N. has "meltdowns," in which he throws himself on the floor and bangs his head on the ground until she can get him under control. She said that after he returned from visits with the mother, he would have diarrhea and was very clingy. The child called Nichols and her husband "mommy" and "daddy," and she said that they were interested in adopting K.N. if the opportunity arose.
The mother testified that shortly before the hearing, she had signed a voluntary agreement with Polk County DFACS to extend its custody of her three older children because she was not in a position to provide for them. She stated that she had been out of work from four to six weeks and had been *717 fired from the nursing home because she hurt her back. She said that she had been living with her boyfriend, who was the father of K.N. and another of her children for the last six months and before that, had lived in a trailer park for about one year. They had been together, during the periods when he was not imprisoned, since 1991.
The mother admitted that her boyfriend had gone to jail a number of times and on one occasion for hitting her. She also admitted that she had hit him with the back of a toilet tank lid, for which he needed stitches. She said she hit him with the toilet lid because he was hitting her. This occurred when two of her children were home. She acknowledged that witnessing such violence could cause problems for her children, but she felt that by talking to them she could avoid any long-term impact.
The mother was aware that K.N. has special needs. She said she had heard from the man who brought the child to visit her that he had some kind of nerve problem that made it hard for him to stand or walk and which would require braces. She knew that K.N. took daily medication for his HIV, but she did not know what K.N.'s other conditions were and did not write the information down when it was provided to her.
The mother testified that she had attended seven counseling sessions with a counselor whose name she could not remember. Although she had three more sessions to attend, she could not afford the $5 session fees. But she did not agree that this meant she would have financial difficulties caring for a special needs child like K.N. She said that she delayed so long in seeking treatment with the counselor because she had problems getting there. And although the mother's counselor discussed with her the problems inherent in maintaining a relationship with a boyfriend who was frequently in jail and sometimes violent, she felt that they could "work it out." The mother admitted that she had not seen her medical doctor for about one year due to transportation problems despite the fact that her case plan required her to see him more frequently.
The mother testified that her visits with K.N. had been better since she was able to see him at her home in Polk County. She said that he did not scream throughout the entire visit any longer and she was able to hold him more and even feed him.
Psychologist Richard Hark testified that he evaluated the mother after she was referred to him in 1995 by the Division of Rehabilitative Services for help in determining if they could place the mother in a job. At the time, he determined that the mother had a relatively low IQ, which put her in the borderline or mildly retarded range. He concluded that she was an extremely dependent person and felt that her goal at the time was to find a man to support her as opposed to going back to work. He also said that she had many "vocational road blocks," including a need for a job coach to motivate her and for reliable babysitters and transportation.
Dr. Hark testified that he did a parent suitability evaluation of the mother in December 2001 at DFACS request. After reviewing the mother's employment and personal history, the doctor reported that the mother was a very limited individual with a full scale IQ of 70, which was on the borderline between mild mental retardation and borderline retardation. He said that the mother read at the first grade level, so she was basically illiterate and unable to read simple information. He also diagnosed her as having dependent personality disorder, which he defined as being pathologically dependent upon other people to take care of one's psychological and physical needs. He opined that this condition would affect one's ability to care for children in two ways: (1) the affected individual would place his or her needs above those of the child's, even if it meant that the child might be subjected to dangerous, unhygienic or inappropriate situations as a result, and (2) the individual would not make decisions thoughtfully or with confidence, and would be easily influenced by other people. Dr. Hark also expressed concern about the mother's choice of a domestic partner in light of their history of violence and her belief that their relationship problems had been resolved.
The doctor said that in his April 2003 evaluation of the mother he discovered that *718 her IQ had dropped to 67, placing her in the mild mental retardation range. He felt that her cognitive limitations impacted her ability to parent in that
she would not understand any kind of complex instructions that a doctor would give her about her children or herself. She would not understand more than very, very concrete instructions given to her about parenting. She would make very bad decisions and judgments about any sort of complex issue. She is only capable of doing very simple routine repetitive basic things like vacuuming or doing laundry or something of that sort. So all the subtleties of child rearing would escape her. She just wouldn't understand it.
In addition, Dr. Hark was concerned that the mother was in denial about her own HIV status, noting that "if she doesn't manage her own illness, how is she going to manage her children's illnesses[?]" He did not believe that she was capable of dealing with K.N.'s special needs. He noted that she was unable to keep her own medical appointments and would not be able to manage K.N.'s many appointments and medications.
The doctor also reported on his joint session with the mother and K.N. He said that the child had to be torn out of his foster mother's arms to come to the visit. He said that K.N. was terrified of the mother and cried the whole time he was with her. The only time he stopped crying was when he came to stand next to Dr. Hark, a complete stranger to the child. When the visit ended, K.N. called for his "momma," the foster mother, and stopped crying the moment he was returned to her. He described the encounter as a "failed session," and said that the mother was unable to establish any kind of basic relationship with the child.
Based upon all the evidence and the guardian ad litem's recommendation that termination of the parental relationship with the mother was in K.N.'s best interest, the juvenile court entered an order terminating the mother's parental rights to the child.
In determining whether to terminate parental rights, courts apply a two-step analysis:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000). See also OCGA § 15-11-94(b)(4)(A).
a. Parental misconduct or inability. We find that there was clear and convincing evidence to support a finding by the juvenile court of parental misconduct or inability based upon the statutory factors.
(1) Deprivation. Because the mother did not appeal the juvenile court's order adjudicating K.N. as a deprived child, she is bound by that determination, "and the first factor is satisfied." (Citation and punctuation omitted.) In the Interest of J.T.W., 270 Ga.App. 26, 33(2)(a), 606 S.E.2d 59 (2004). See also In the Interest of I.S., 278 Ga. 859, 607 S.E.2d 546 (2005).
(2) Lack of proper parental care or control as cause of deprivation. In support of its adjudication that K.N. was deprived, the juvenile court found that the child "was without proper parental care or control." The mother's failure to appeal the deprivation order also renders the juvenile court's determination on this second factor binding. In the Interest of A.G., 253 Ga.App. 88, 89(1)(b), 558 S.E.2d 62 (2001); In the Interest of R.G., 249 Ga.App. 91, 93(1)(a), 547 S.E.2d 729 (2001).
Moreover, the evidence at the hearing supports such a finding. In making a determination on this second finding when the child is not in the parent's custody, the juvenile court may consider, inter alia, whether the parent "failed significantly for a period of one *719 year or longer" prior to the filing of the petition for termination of parental rights to (1) develop and maintain a parental bond with the child in a meaningful, supportive manner or (2) to comply with a court-ordered reunification plan. OCGA § 15-11-94(b)(4)(C). See also In the Interest of J.G.J.P., 268 Ga.App. at 618(1), 602 S.E.2d 320.
We find that there is clear and convincing evidence to support the juvenile court's findings that the mother failed to develop or maintain a parental bond with K.N. for more than one year before the filing of the petition for termination in April 2003. The mother only attended thirty-eight out of seventy-nine scheduled visits for which the child was made available, two of which occurred only one month before the hearing when DFACS arranged to have the child brought to her home. And although DFACS first took custody of the child in December 2001, Dr. Hark testified that as of his joint session with K.N. and the mother in April or May 2003, she had failed to develop any kind of "basic relationship" with the child. The mother herself conceded that up until July 2003 when K.N. was brought to her home, the child had screamed all through his visits with her.
Additionally, there was ample evidence to demonstrate that the mother had failed to comply with her case plan. Although she had maintained housing of some description, she had moved from Floyd County in violation of the juvenile court's order that she secure the court's permission before doing so. And although she had maintained a job, she had lost that job four to six weeks before the hearing and was unable to pay the $5 per session fee to complete her therapy for her mental and emotional health. In fact, she did not even begin the therapy until March 24, 2003, essentially one year after her case plan was implemented on March 26, 2002, and more than fifteen months after the child was removed by DFACS. In addition, she had failed to comply with the case plan's requirement that she seek medical treatment for herself. She had not been to see her doctor for more than one year, despite the potential seriousness of her condition.[1] And she had failed to follow up on DFACS referrals to other services to help her understand and manage her condition. And as previously noted, she failed to develop a parent-child bond with K.N. as required by the case plan. Moreover, she did not contribute to K.N.'s support while he was in DFACS custody. Although the case plan did not specifically require the mother to pay child support, "[a] parent . . . has a statutory duty to support her children, with or without a court order. OCGA § 19-7-2." (Citation and punctuation omitted.) In the Interest of J.J., 259 Ga.App. 159, 162, 575 S.E.2d 921 (2003).
In addition, the juvenile court may also consider under this factor a "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional or moral condition and needs of the child." OCGA § 15-11-94(b)(4)(B)(i). Dr. Hark testified that the mother had a low IQ and limited cognitive abilities, as well as dependent personality disorder, which impaired her ability to attend to K.N.'s many special needs. In addition, the mother failed to keep her own medical appointments. Nor did she seem to understand the full potential impact that domestic violence between her and her boyfriend might have on her children. This evidence supports the doctor's conclusions that her limited mental functioning impaired her ability to parent K.N.
(3) The cause of the deprivation is likely to continue. We find that there was clear and convincing evidence to demonstrate that the cause of K.N.'s deprivation was likely to continue. As we have noted, the mother failed to comply with her case plans, especially with regard to obtaining counseling for her own medical and physical needs. "[A] parent's failure to comply with the requirements of court-mandated mental health counseling. . . is a factor [to] be considered to determine the likelihood of whether the deprivation is likely to continue or will not *720 likely be remedied." In the Interest of G.L.H., 209 Ga.App. 146, 150(2), 433 S.E.2d 357 (1993).
Moreover, there was evidence that the mother was in denial about her own physical health and that she did not actively pursue the avenues of treatment and counseling offered to her in that regard and in connection with her emotional needs. The juvenile court could properly consider the mother's unwillingness to consistently treat her mental or physical conditions as factors in concluding that the deprivation was likely to continue. See In the Interest of B.B., 268 Ga.App. 858, 861(3)(a), 603 S.E.2d 333 (2004). Dr. Hark's testimony regarding the mother's cognitive abilities and dependent personality disorder also supported this conclusion. The psychologist testified that although treatment is available for dependent personality disorder, individuals with an IQ such as the mother's were difficult to treat because they are "not psychologically mindful."
(4) Continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. Given the complex and serious nature of K.N.'s physical condition and his special needs, we find that the evidence clearly and convincingly supported a finding that the deprivation was likely to cause him serious harm. The foster mother testified that K.N. requires a stable routine, with constant monitoring of his physical symptoms, to maintain his emotional and physical health, and Dr. Hark testified that the mother would be unable, given her cognitive abilities, to provide the care the child needed.
(b) Best Interest of the Child. The evidence presented at the hearing and discussed above supported the juvenile court's conclusion that terminating the mother's parental rights was in the best interest of the child. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" In the Interest of D.L., 268 Ga.App. 360, 360-361, 601 S.E.2d 714 (2004). Moreover, there was evidence that K.N.'s visits with his parents were disturbing to him and that he was doing well in the custody of DFACS and would benefit from the stability of staying with his capable, caring foster parents. See OCGA § 15-11-94(a) (court may consider children's need for a secure, stable home); In the Interest of H.H., 257 Ga.App. 173, 176(1)(b), 570 S.E.2d 623 (2002).
Judgment affirmed.
RUFFIN, C.J., and BERNES, J., concur.
NOTES
[1] Although the state failed to present specific evidence of the mother's HIV diagnosis, she acknowledged that she was required to see a doctor under her case plan and she acknowledged that K.N. had tested positive for HIV.