651 S.E.2d 332 (2007)
In the Interest of B.W., a child.
In the Interest of B.W., a child.
Nos. A07A1486, A07A1487.
Court of Appeals of Georgia.
Decided July 9, 2007.
Reconsideration Denied August 1, 2007.
*334 Robert E. Brooks Jr., James S. Astin, Cedartown, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Billie J. Crane for appellee.
JOHNSON, Presiding Judge.
These appeals involve an order of the juvenile court terminating the mother's and the father's parental rights to five-year-old B.W. In Case No. A07A1486, the mother contends the juvenile court erred in finding that (1) B.W.'s deprivation is likely to continue and is unlikely to be remedied, (2) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to B.W., (3) termination of her parental rights is in the best interest of B.W., and (4) sufficient evidence exists regarding efforts to locate a suitable relative placement for B.W. In Case No. A07A1487, the father contends the juvenile court erred in all of the above. He further asserts that the court erred in finding clear and convincing evidence of deprivation based on any fault of the father. Because the cases involve essentially the same set of facts, we have consolidated them for appeal. We find no reversible error and affirm the juvenile court's order terminating both parents' parental rights.
The evidence presented at the parental rights termination hearing revealed that *335 B.W. has twice been removed by the state from the legal and physical custody of his parentsfirst in 2002 and again in 2004. The first removal occurred on May 17, 2002, when the Polk County Department of Family and Children Services ("the Department") received a report that the father was mentally ill and had threatened to kill the mother and two-month-old B.W., that the father had committed domestic violence against the mother, that the mother was in jail,[1] and that both parents had a history of domestic violence and drug use. The juvenile court issued a shelter care order and placed B.W. in protective custody. The juvenile court subsequently found B.W. deprived, noting that both parents were incarcerated for drug offenses at the time of the hearing, that the father had a history of mental illness which included violent behavior, and that there were issues of domestic violence and drug use with both parents.
On September 5, 2002, the juvenile court conducted an adjudicatory hearing on the Department's deprivation petition against the father. The father stipulated at the hearing that he was arrested on May 19, 2002 for violation of the Georgia Controlled Substances Act and possession of a firearm in the commission of a felony, that both he and B.W.'s mother were presently in jail, that he had a history of mental illness which would interfere with his ability to parent, and that B.W. was without proper parental care or control. The juvenile court found that B.W. was deprived due to his father's substance abuse and mental impairment. A psychiatrist who examined the father after his release from jail indicated that because of the father's mental condition, the father could not care for B.W. The Department received temporary custody of B.W. On December 12, 2002, the juvenile court conducted a review hearing wherein the Department informed the court that the father's parenting classes were ceased after one of the employees witnessed the father making death threats against the mother. The court ordered the Department to provide the father with the names and telephone numbers of other agencies providing parenting classes. These orders were not appealed.
On September 26, 2002, the juvenile court conducted an adjudicatory hearing on the Department's deprivation petition against the mother. The mother stipulated that she had been arrested for drug possession on May 14, 2002, that she entered a guilty plea and was currently serving five years on probation, that she did not have a stable home or income to support B.W., and that B.W. was without proper parental care or control. The juvenile court found that B.W. was deprived due to the mother's substance abuse, mental/physical impairment, neglect/inadequate housing, and no income to support herself or the child. This order was not appealed.
Case plans adopted by the court as part of its orders required the father and mother to maintain a bond with B.W., cooperate with the Department and other agencies, obtain psychological evaluations, complete parenting education classes, obtain drug assessments, and follow all recommendations. These orders were not appealed.
On April 2, 2003, the Department filed a motion to extend custody of B.W. In its motion, the Department noted that the mother had failed to comply with case plan goals by not following the recommendations of the mental health assessment, by not attending and completing the drug and alcohol program, and by not completing in-home therapy sessions. The Department noted that the father had failed to comply with case plan goals by not cooperating with the Department, by not obtaining counseling, and by not obtaining a drug assessment. In fact, the Department informed the court that the father had threatened the caseworker with bodily harm, had threatened a counselor, and had refused to take a drug test. Following a hearing on the motion, the juvenile court continued custody of B.W. in the Department. The court found that the parents were working to improve their circumstances, but had not yet completed treatments. That order was not appealed.
On July 3, 2003, the mother violated her probation by failing to complete a drug *336 screen, was incarcerated until September 11, 2003, and then placed on intensive probation. The father filed for and was granted a divorce and legal custody of B.W. The order stated that the mother could have no visitation with B.W. until she petitioned the court and showed a substantial change in her lifestyle and addiction. On December 11, 2003, the mother absconded supervision and was then arrested on January 20, 2004, wherein she admitted using marijuana and cocaine. The superior court sentenced her to spend 60 days in jail, suspended upon her entering and completing a drug treatment program.
On July 14, 2004, the mother was arrested again after failing to report to her probation officer, moving without permission, and admitting to cocaine use. The superior court sentenced her to participate in its court drug program for the next 18 months. On December 30, 2004, the mother violated her probation again for failing to attend mandatory drug treatment meetings. She was sentenced to enroll in an approved inpatient drug treatment program. On March 18, 2005, the mother violated her probation again for continued failure to comply with court drug regulations and was sentenced to enroll in another inpatient drug treatment program. On October 4, 2005, the mother was sentenced to serve one week in jail for her continued failure to comply with court drug regulations. On November 15, 2005, the mother was sentenced to serve 30 days in jail for continuing to fail to comply with drug court regulations. She was subsequently terminated from the court drug program for her repeated noncompliance. On May 4, 2006, the mother's probation officer filed a complaint alleging that she violated her probation by failing to complete the court drug program. The superior court found that the mother had violated her probation and ordered her to remain incarcerated until December 6, 2006.
In the meantime, on July 1, 2004, the father was arrested for DUI while B.W. was in the car, and the juvenile court issued another shelter care order to place the child in protective custody. On July 7, 2004, the paternal grandmother filed a protective order petition against the father, alleging that he abused drugs and alcohol and had threatened to kill her on a number of occasions. A protective order was granted, but the paternal grandmother later withdrew her petition.
On July 12, 2004, the Department filed a new deprivation petition alleging B.W. was deprived because the father was arrested for DUI with B.W. in the car, the father ran a stop sign and was driving in an unsafe manner with B.W. in the car, the father has mental health issues which interfere with his ability to parent, and the mother's whereabouts were unknown. Once again, the juvenile court found B.W. deprived due to his father's conduct and placed the child in the Department's custody. The court noted that not only was the father driving while under the influence of alcohol with B.W. in the car, but a loaded gun was found on the front seat of the car, the father made threats of physical harm and death to the officers, and the father's conduct suggested he was emotionally unstable. This order was not appealed.
In the disposition hearing and subsequent review hearings, the juvenile court found that B.W. could not be adequately and safely protected in the home of his father because the father exhibited serious lack of judgment concerning the child's welfare while driving under the influence with a loaded firearm in the vehicle. The court further found that the father denied doing anything to endanger B.W. and remained obsessed with the thought that the paternal grandmother and others were trying to take the child away from him. The court required the father to undergo a psychiatric evaluation because the father's prior testing and diagnosis indicated that the father may not be able to consistently parent the child and meet the child's needs; however, the father failed to address the issues causing B.W.'s deprivation: he had not completed his psychological evaluation or his neuropsychological assessment, and he had not regularly attended AA meetings. The caseworker testified that the father was paranoid, complained of plots against him, and was taking Xanax, OxyContin, and morphine. She further testified that B.W. had not bonded with his father and resisted when the father hugged him. The father physically dominated B.W. rather than showed affection. *337 The caseworker did not believe that services would improve the father's parenting skills because of his paranoia and his refusal to listen to counselor suggestions. The juvenile court maintained custody of B.W. with the Department. These orders were not appealed.
In a July 12, 2005 hearing on the Department's deprivation petition, the juvenile court found that the mother was still incarcerated for violating her probation on an underlying drug possession conviction and would not be released from jail until December 6, 2006. The mother admitted that she had been addicted to drugs for seven years, acknowledged that she failed miserably as B.W.'s mother, and stated that she had not seen B.W. since November 2003. The juvenile court also found that a psychologist diagnosed B.W. with a developmental and attachment disorder and opined that an average parent could not parent B.W. because of his therapy needs. The juvenile court further found that the father had been diagnosed with schizoaffective disorder and was unable to be even an average parent because he would not comply with therapy and believed his DUI arrest was a plot to kidnap B.W. The juvenile court maintained custody with the Department and ordered the mother to resolve her legal issues, remain drug free for a minimum of six months once she was released from jail, and resolve any orders from other courts prohibiting her having contact with the child. The court ordered the father to attend at least one year of mental health therapy, six months of parenting training, and a parenting assessment. New case plans were adopted by the juvenile court. Those orders were not appealed.
On February 1, 2006, the juvenile court cancelled a review hearing due to the father's incarceration for failure to appear in court on a warrant.
On September 1, 2006, the Department filed a petition to terminate the mother's and father's parental rights. The juvenile court conducted the termination hearing from November through December 2006. Tracy Alvord, a counselor, testified she conducted a substance abuse assessment of the mother. During this assessment, the mother admitted using crack cocaine since 1988, stated that she had been to drug treatment several times but always relapsed, and acknowledged that she had not remained drug free for more than eight or nine months. The mother also admitted to excessive alcohol use and occasional marijuana, prescription painkiller, and methamphetamine use. According to the mother, she had not seen B.W. since he was a year old. The counselor opined that the mother would need to stay drug free for a minimum of one year after she was released from jail before considering reunification with B.W. She also noted that the mother's repeated relapses were indicative of her ability to handle her drug issues in the future.
The counselor testified that the father hung up on her, left one interview after he became irate, and failed to appear for another scheduled interview. She observed two visits with B.W. and reported that B.W. did not return his father's affections and that the father repeatedly vented about being "set up" to lose custody of B.W. She expressed concern because the father would not take direction, quickly became agitated, had substance abuse issues and a history of not taking his medication, could not avoid becoming hostile, and had no family support.
Dr. John Arroyo, a psychologist, testified that he began treating B.W. in February 2006 for developmental delays, opined that the child would need years of therapy, and recalled that during a visit B.W. ran away from the father to sit with the psychologist. According to the psychologist, B.W. needed a patient parent who knew many behavior interventions, and B.W.'s home life and foster care had harmed his ability to bond. The child needed permanency. The psychologist also indicated that he had experience treating people with drug and alcohol addictions and opined that less than 20 percent of people with crack cocaine addictions successfully overcame their drug problems and that with every relapse the percentage decreased and it was more difficult to recover.
A caseworker assigned to the case from July 2004 until March 2005 testified that during the time she had the case, she had no contact with the mother and the mother never called the Department to check on the *338 child. The caseworker attempted to find the mother but had no luck in determining her whereabouts and never heard from any maternal relatives about placement of the child. The caseworker testified that the father failed to complete psychiatric evaluations or submit to drug screens because he thought all the doctors were "in cahoots with" the Department and the Department had paid off the drug testing people. He ignored any instruction or advice, complained about injustices in the legal system, and failed to improve his parenting skills.
According to the caseworker, B.W. exhibited severe developmental delays. The child was placed in several foster homes while she had the case, including two homes where the foster parents requested the child's removal because they feared the father. The caseworker testified that she did not place B.W. with the paternal grandmother because the grandmother could not protect B.W. and the father lived with either the grandmother or with the paternal aunt who feared the father would harass her; there were no other relatives who expressed an interest in having custody of B.W.
A counselor assigned during the same time frame testified that the father resisted working with her. The father was loud, hostile and complained that the legal system was out to get him. The father told the counselor to shut up and threatened to put duct tape over her mouth or "go after her" if she got in his way. She observed that he was rough with B.W. and never improved his parenting skills. Another counselor testified that the father claimed his DUI arrest was a police mistake. She noted that the father was very defensive and denied any drug, alcohol or mental health problems. The counselor concluded that the father had a substance dependence disorder.
Another case manager for the Department, who had been assigned the case since March 2005, testified that her first contact with the mother occurred prior to Christmas in 2005. The mother had just gotten out of jail and appeared at the Department's office unannounced. When the caseworker learned that the mother was not allowed visitation with B.W. pursuant to the divorce decree, she informed the mother that she would have to address that situation before being given any visitation. The caseworker later attempted to contact the mother at a church homeless shelter where she was staying, but learned that the mother had been sent back to jail. The caseworker expressed concern that the mother had not addressed her drug addiction, was unstable, needed training for B.W.'s special needs, and was not bonded with B.W.
The caseworker further testified that the father had failed to comply with court-ordered mental health therapy and a parenting course. She monitored his visits with B.W. and noted that the father still had parenting issues. According to the caseworker, she was looking for an adoptive home for B.W. and recommended termination of the mother's and father's parental rights.
A psychologist who examined the father testified that the father's IQ placed him in the cognitively impaired range. His achievement tests showed that he read, spelled and did arithmetic at a fifth grade level or less, indicating academic impairment. According to the psychologist, the father had trouble with his anger impulses and could not adjust to B.W.'s needs. The father was dishonest on two parenting tests, and the psychologist opined that the father would not succeed in any mental health treatment because of his dishonesty. The father denied ever being arrested or taking medication for mental health problems and alleged that his DUI arrest was a planned kidnapping, which statement was indicative of his paranoid thinking. The father was diagnosed with schizoaffective disorder, poly-substance dependence, intermittent explosive disorder, and paranoid personality disorder. The psychologist opined that B.W. would not be safe with the father due to the father's inability to respond to a child's signals or to control himself. He also opined that the father would be unable to care for a special needs child and recommended no unsupervised visits with B.W.
Another counselor testified that she conducted a family assessment in 2002 and did an extensive family search, but could not find any relatives with which to place B.W. She searched again in July 2004 and still found no *339 relatives for placement. The counselor also testified about her interviews with the family members. In 2002, the counselor interviewed the mother in jail and performed a parenting assessment in which she concluded that the mother had poor parenting skills, was depressed, was impatient with children, did not understand alternatives to corporal punishment, and expected a child to do exactly what she told him to do, which the counselor opined was impossible for a child with B.W.'s limitations. She also interviewed the father in jail and noted his mental distress and that he could not read the parenting inventory even though it had been written on a fourth grade level. The counselor also interviewed the father's mother and sister, who stated that the father had threatened them.
The counselor evaluated B.W. in 2004 and found that he was developmentally delayed and had poor attention and arousal. She again evaluated B.W. on January 4, 2006 and noted that he previously was diagnosed with reactive attachment disorder, had a full scale IQ of 52, behavioral problems, and developmental delays, was self-injurious, and would probably never live independently. She opined that B.W. needed permanency and that a parent with the mother's ongoing drug problems would jeopardize permanency for him. She also opined that there were not enough services to make the father an able parent.
The mother testified that she had been incarcerated for the past nine months after violating her probation. Her probation had been revoked three times in the past four and one-half years. The mother further admitted that she had previously been convicted of drug possession in 2002 and had drug problems for the past seven or eight years. She acknowledged all her relapses following drug treatment programs, and she conceded that she last used drugs on February 14, 2006. According to the mother, B.W. was first placed in foster care in 2002, after her drug arrest. At the time, she was staying in a battered women's shelter because she and the father had a domestic dispute. She admitted she has not seen B.W. since he was one year old and that she did not know anything about B.W. other than what she had heard in court. She asserted that she would be released on December 6, 2006 and was working on having a place to live when she got out.
The father testified that he had not worked regularly for two years, collected disability benefits and sometimes did contract work. He admitted living with his mother in a house with a number of firearms, and also claimed he owned several other firearms that he had buried. The father acknowledged that he was not receiving any mental health therapy or taking any medication. He insisted he was told he did not need drug/alcohol treatment and believed that counselors had forged documents to show that he needed therapy. He also admitted he had not received any psychological evaluation, and blamed his attorney. While he admitted being hospitalized for mental health issues, he claimed it was a joke and that he did not need treatment. He alleged police put vitamin B-3 in his house and altered a videotape of his DUI arrest.
The guardian ad litem filed a written recommendation stating that termination of the mother's and the father's parental rights was in B.W.'s best interest. On January 17, 2007, the juvenile court entered written orders terminating the mother's and the father's parental rights. The parents appeal.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[2] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition *340 and needs, including the need for a secure, stable home.[3]
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated.[4] In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[5]

Case No. A07A1486
1. The mother contends the juvenile court erred in finding that her deprivation of B.W. is likely to continue and is not likely to be remedied because she has not had a reasonable opportunity to reunify with B.W. According to the mother, she is no longer incarcerated, she has had her divorce decree visitation restriction lifted, and she is now in a position to pursue reunification with B.W. Despite the mother's present attempts to reunify with B.W., we find clear and convincing evidence that the mother's deprivation of B.W. is likely to continue or is not likely to be remedied.
The record reveals that while B.W. was in the Department's custody, the mother repeatedly violated her probation and was incarcerated, failed to pay child support, failed to complete a drug treatment program, and failed to maintain contact with the Department. At the time of the termination proceeding, the mother had not supported B.W., had been repeatedly incarcerated, had not seen the child in three years, acknowledged that she was addicted to drugs and needed counseling, had not completed a recommended drug abuse program, failed to present any evidence of stable housing or employment, and failed to comply with any of her case plan goals. While she has been to drug treatment several times, she has always relapsed and has not remained drug free for more than eight or nine months. Her probation was revoked three times in the past four and one-half years because of her drug use and failure to comply with court drug mandates.
It is well settled that the juvenile court may consider the parent's past conduct in determining that such conditions of deprivation are likely to continue.[6] Moreover, this Court has recently held that
evidence of the mother's long history of drug abuse, failure to complete her reunification case plan, and repeated willingness to place her drug addiction over her child's needs was sufficient to authorize the juvenile court to find by clear and convincing evidence that [B.W.'s] continued deprivation was likely to continue and not be remedied.[7]
The trial court was authorized to find that the mother's long history of un-rehabilitated abuse of drugs was likely to continue and rendered her incapable of providing for B.W.'s needs.
2. The mother contends the juvenile court erred in finding that her continued deprivation is likely to cause serious physical, mental, emotional or moral harm to B.W. We disagree. The same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm.[8]
Here, the mother's repeated failure to remain drug free, combined with her failure to complete essential elements of her case plan, demonstrate an unresolved pattern of misbehavior that would be likely to cause severe *341 emotional harm to the child.[9] An expert testified at the hearing that the mother's felony drug conviction, repeated probation violations and numerous incarcerations had a demonstrable negative effect on the quality of the parent-child relationship.[10] In fact, the mother admitted she had not seen B.W. since he was one year old and knew nothing about him other than what was told in court. The evidence further shows that the mother never sent B.W. any cards, letters or gifts or otherwise attempted to maintain contact with him. Despite her assertion that her divorce decree did not allow her to visit B.W., the record shows that the mother's inability to pursue a familial relationship with the child is not the result of state action, but the result of her own criminal actions.[11] The evidence clearly supports the juvenile court's conclusion that continued deprivation is likely to cause serious harm to B.W.
3. The mother asserts the juvenile court erred in finding that termination of her parental rights is in the best interest of B.W. In determining how the interest of the child is best served, the juvenile court is vested with a broad discretion which will not be controlled in the absence of manifest abuse,[12] which we do not find here.
It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[13] And, at least one psychologist testified that B.W., who has been in and out of foster care for the past five years, needs stability and it would not be in B.W.'s best interest to wait for his mother to stabilize her life and put her drug dependency behind her because the longer B.W.'s instability persists, the longer it takes for him to attach. According to the psychologist, a parent with the mother's history of substance abuse is not qualified to care for B.W.'s special needs because the parent's priority will be her substance abuse and not the child. Both the caseworker and guardian ad litem recommended that the juvenile court terminate the mother's parental rights and concluded that permanency was in the best interest of B.W.
In addition, the same factors that show parental misconduct and inability support a finding that termination of parental rights is in the child's best interest.[14] And, the juvenile court is authorized to consider a child's special needs and the parent's inability to provide for those needs.[15] Here, the Department presented extensive evidence about B.W.'s developmental delays and behavioral issues, as well as how the mother's drug addiction and lack of parenting training negatively affected his need for permanency. Considering the special needs of B.W., the harmful effects of prolonged foster care, and the evidence of the mother's drug abuse and failure to comply with case plan goals, the juvenile court was authorized to conclude that terminating the mother's parental rights is in the best interest of B.W.
4. The mother contends the juvenile court erred in concluding that the Department met its burden in demonstrating that it diligently pursued and investigated relative placement. This Court will not disturb a juvenile court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion,[16] which we do not find here.
The record reveals that the Department investigated several relatives when custody *342 of B.W. was placed with the Department in 2002 and, again, in 2004. The search did not reveal any interested relatives. "Where some evidence exists showing compliance with the dictates of [OCGA § 15-11-103], there is no basis for reversal."[17] In addition, the record shows that neither the father nor mother timely provided the names and addresses of any additional relatives for consideration.
The paternal grandmother was the only relative who showed any interest as a placement source, but the juvenile court agreed with the Department's determination that she was not a proper placement given that she could not control her son and given her incredulous testimony that she never had any problems with or fear of the father in spite of the contradictory evidence, including her petition for a protective order against the father. We find no abuse of discretion in the juvenile court's finding that placing B.W. with the Department was in his best interest upon termination of his parents' rights.[18]

Case No. A07A1487
5. The father contends the juvenile court erred in finding clear and convincing evidence that B.W.'s deprivation was due to his inability or fault. Specifically, he argues that "[t]he Department equally caused the continued deprivation." The father blames his inability to complete his case plan goals on a lack of cooperation and assistance of the Department, and argues that the testimony of the doctors and caseworkers was unreliable and biased. We find no error.
We first note that the juvenile court previously determined that B.W. was deprived and entered deprivation orders and extension of custody orders that were not appealed. The father is therefore bound by the juvenile court's prior findings of deprivation.[19] The father's failure to appeal the deprivation orders also renders the juvenile court's determination that the deprivation was due to the father's lack of proper parental care or control binding.[20]
Moreover, the evidence at the hearing supports such a finding. Not only did the father fail to comply with the Department's case plan goals, but he failed to acknowledge or address his mental health problems. The juvenile court may consider a "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child."[21] Witnesses testified regarding the father's low IQ, limited academic abilities, mental conditions, and personality disorder, which impaired his ability to attend to B.W.'s many special needs.
As for the father's argument that the witnesses were unreliable and biased, this Court neither weighs the evidence nor determines the credibility of the witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[22] The Department showed that, despite years of intervention and assistance from it, the father utterly failed to manage his anger, control his alcohol and substance abuse, and demonstrate any insight into his mental health problems. The evidence was clear and convincing that the father was the cause of B.W.'s deprivation.
6. The father asserts the juvenile court erred in finding clear and convincing evidence that any deprivation is likely to continue or unlikely to be remedied. Again, we find no error. As we have noted, the father failed to comply with his case plans, especially with regard to obtaining counseling for his mental health needs. "A parent's failure to comply with the requirements of court-mandated mental health counseling is a factor to be considered to determine the *343 likelihood of whether the deprivation is likely to continue or will not likely be remedied."[23] In addition, evidence that a parent's intellectual functioning would make it very hard to raise a child alone supports a finding of the likelihood of future deprivation.[24] And, here, there is ample evidence of the father's low intellectual functioning and its negative impact on his parenting skills.
Moreover, there was evidence that the father was in denial of his own mental health problems. Although he has a long history of mental illness, violence and paranoia, the father chooses to blame others for his problems and refuses to seek counseling. Prior to B.W.'s placement in foster care, the father had a history of mental illness, domestic violence and incarceration. While B.W. was in the Department's custody, the father was unemployed, failed to provide any financial support for B.W., was incarcerated three times, did not comply with court-ordered mental health evaluations and treatment, failed to complete court-ordered parenting classes, drove while under the influence of alcohol with B.W. and with a loaded gun in the car, and was not cooperative with the Department. A court can consider a parent's past conduct in determining whether conditions of deprivation are likely to continue.[25] Here, the evidence was sufficient to support the juvenile court's finding.
7. The father next asserts that the juvenile court erred in determining that any continued deprivation would cause or is likely to cause serious physical, mental, emotional or moral harm to B.W. According to the father, "[t]he deprivation was caused by DFCS' lack of services and multiple abusive foster placements" and the Department is causing harm to B.W. Again, it is the juvenile court's responsibility to weigh the evidence and determine the credibility of the witnesses. We find no error in the juvenile court's determination that the father's continued deprivation would cause or is likely to cause serious harm to B.W.
The same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm.[26] As additional evidence in support of this factor, there was testimony that B.W.'s home and foster care experiences had harmed his ability to bond and he needed permanency. We have previously held that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[27]
8. The father contends the juvenile court erred in finding that termination of his parental rights was in B.W.'s best interest. However, doctors who evaluated the father testified that B.W. would not be safe with the father and that the father would not be able to parent a special needs child like B.W. The juvenile court is authorized to consider a child's special needs and the parent's inability to provide for those needs.[28]
In addition, the father failed to maintain a parental bond with the child in a meaningful way. Witnesses testified that B.W. tried to get away when the father hugged him and that the father physically dominated B.W. rather than showing him affection. And, the same factors which show the existence of parental misconduct or inability can also support a finding that termination of parental rights is in the child's best interest,[29] including the father's refusal to acknowledge or obtain treatment for his mental health problems.
B.W. has been in and out of foster care for nearly five years, and his guardian ad litem recommended that termination of the father's parental rights would be in B.W.'s best interest. *344 In fact, one counselor opined that there were not enough services available to make the father an able parent. We find sufficient clear and convincing evidence to support the juvenile court's determination that terminating the father's parental rights was in the best interest of B.W.
9. In his final enumeration of error, the father argues that the juvenile court erred in finding that the Department conducted a diligent search for relatives with which to place B.W. For the reasons stated above in Division 4, we find no merit in this argument.
Judgment affirmed in both cases.
PHIPPS and MIKELL, JJ., concur.
NOTES
[1] On May 14, 2002, the mother was arrested for drug possession.
[2] OCGA § 15-11-94(b)(4)(A)(i)-(iv).
[3] OCGA § 15-11-94(a).
[4] In the Interest of S.L.B., 265 Ga.App. 684, 687(1), 595 S.E.2d 370 (2004).
[5] Id. at 684, 595 S.E.2d 370.
[6] See In the Interest of T.B., 267 Ga.App. 484, 486(1), 600 S.E.2d 432 (2004).
[7] In the Interest of E.J., 284 Ga.App. 814, 817, 644 S.E.2d 906 (2007).
[8] See In the Interest of K.A.S., 279 Ga.App. 643, 651(1)(d), 632 S.E.2d 433 (2006).
[9] In the Interest of K.W., 283 Ga.App. 398, 401(1)(d), 641 S.E.2d 598 (2007); In the Interest of L.W., 276 Ga.App. 197, 201(2), 622 S.E.2d 860 (2005).
[10] See OCGA § 15-11-94(b)(4)(B)(iii).
[11] See In the Interest of A.C., 272 Ga.App. 165, 168-169(3), 611 S.E.2d 766 (2005); Turner v. Wright, 217 Ga.App. 368, 369(1), 457 S.E.2d 575 (1995).
[12] See In the Interest of M.L.P., 236 Ga.App. 504, 510(1)(d), 512 S.E.2d 652 (1999).
[13] See In the Interest of B.I.F., 264 Ga.App. 777, 781(1), 592 S.E.2d 441 (2003).
[14] See In the Interest of B.J.F., 276 Ga.App. 437, 443(2), 623 S.E.2d 547 (2005).
[15] See In the Interest of M.W., 275 Ga.App. 849, 854(3), 622 S.E.2d 68 (2005).
[16] See In the Interest of S.V., 281 Ga.App. 331, 333(2), 636 S.E.2d 80 (2006); In the Interest of A.L.S.S., 264 Ga.App. 318, 324(2), 590 S.E.2d 763 (2003).
[17] In the Interest of S.V., supra at 332(1), 636 S.E.2d 80.
[18] See In the Interest of L.G., 273 Ga.App. 468, 476(3), 615 S.E.2d 551 (2005).
[19] See In the Interest of M.S., 279 Ga.App. 254, 261(1), 630 S.E.2d 856 (2006).
[20] See In the Interest of K.N., 272 Ga.App. 45, 52(a)(2), 611 S.E.2d 713 (2005).
[21] OCGA § 15-11-94(b)(4)(B)(i).
[22] See In the Interest of M.S., supra at 254, 630 S.E.2d 856.
[23] (Citation and punctuation omitted.) In the Interest of K.N., supra at 53(a)(3), 611 S.E.2d 713.
[24] See In the Interest of A.W., 264 Ga.App. 705, 706-707(1), 592 S.E.2d 177 (2003).
[25] See In the Interest of R.N., 224 Ga.App. 202, 204(1)(c), 480 S.E.2d 243 (1997).
[26] See In the Interest of K.A.S., supra.
[27] Id., at 652, 632 S.E.2d 433.
[28] See In the Interest of M.W., supra.
[29] See In the Interest of K.N., supra at 54(b), 611 S.E.2d 713.