667 S.E.2d 876 (2008)
In the Interest of J.L.S. et al., children.
No. A08A1481.
Court of Appeals of Georgia.
September 23, 2008.
*877 William H. Newton, III, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, Holly A. Bradfield, for appellee.
JOHNSON, Presiding Judge.
Following a hearing, the juvenile court terminated the natural mother's rights to two of her children, nine-year-old J.L.S. and six-year-old L.J.H. The mother appeals, challenging the sufficiency of the evidence supporting termination. For reasons that follow, we affirm.
In reviewing an order terminating parental rights, we construe the evidence favorably to the juvenile court's ruling and defer to that court's factual findings.[1] We do not weigh the evidence or resolve issues of witness credibility, but merely "determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated."[2]
So viewed, the evidence shows that the mother has five children: J.L.S., L.J.H., an older son, and two younger children. In 2003, the mother gave custody of her oldest child to her godmother. The following year, in March 2004, the mother gave temporary custody of J.L.S. and L.J.H. to a friend Tamika Burdetteso that she could "take care of" a bench warrant that had been issued against her in Tennessee. She also left her two younger children with her parents.
The mother served a short time in jail on the bench warrant, then moved to Florida. Approximately two months later, she returned to Georgia to retrieve her two younger children. She took those children back to Florida, but left J.L.S. and L.J.H. with Burdette.
In May 2004, the Department of Family and Children Services ("DFCS") obtained a shelter care order for J.L.S. and L.J.H. after J.L.S. appeared at school with welts allegedly caused by Burdette and her children. The juvenile court subsequently found J.L.S. and L.J.H. deprived based on physical abuse, poor parenting skills by the mother, including her choice of caretakers, and abandonment. DFCS developed a reunification case plan for the mother requiring her to, among other things, obtain a psychological evaluation, attend counseling sessions as indicated by the evaluation, take prescribed medications, secure a source of income and stable housing, and attend parenting classes.
In June 2007, DFCS petitioned to terminate the mother's parental rights, asserting that she had not completed her case plan, that the deprivation had not been remedied, and that the children needed permanency. The juvenile court held a hearing several months later.
At the hearing, the children's DFCS case manager testified that although the mother had satisfied some case plan goals, she failed to complete others. For example, she did not attend all required therapy and medication management sessions, and she did not complete her positive behavior classes. The mother experienced a period of stable employment for approximately 18 months, but had been unemployed for several months at the time of the termination hearing. She had also lived in numerous places since the children were placed in DFCS custody in 2004, including periods of incarceration and homelessness. In the six months prior to the hearing, she had secured stable housing in Florida. Her apartment, however, was too small to accommodate J.L.S. and L.J.H.
The case manager further testified that the mother failed to maintain a meaningful bond with her children and was unwilling to travel from Florida to Georgia to visit them, despite DFCS's offer to bring the children to the Georgia-Florida border. At the time of the hearing, the mother had seen the children only five times since 2004, on occasions *878 when she appeared for panel reviews or court proceedings. The mother had pursued telephone contact with J.L.S., but that contact was sporadic, and, to the case manager's knowledge, she had not maintained telephone contact with L.J.H. As a result, L.J.H. did not know the mother. And although the mother had a bond with J.L.S., it lacked the intimacy of a mother-daughter relationship.
The mother conceded that she made no special trips to Georgia to visit J.L.S. and L.J.H. Nevertheless, she claimed that she understood how to take care of them and did not "see anything wrong" with them returning to Florida with her immediately. At the time of the hearing, she had custody of her two younger children. She admitted, however, that she voluntarily gave up custody of her eldest child and that the State of Florida had placed the younger children in foster care at one point. The mother also had a history of domestic violence against her boyfriend, including when her younger children were in the home asleep, and she had been investigated for disciplining her oldest child excessively.
As required by her case plan, the mother submitted to a psychological evaluation by John Azar-Dickens, a licensed clinical psychologist. During the evaluation, the mother admitted to prior mental health issues, as well as noncompliance with therapy and medication recommendations. She also testified at the hearing that she had "hear[d] voices" in the past.
Following the evaluation, Azar-Dickens diagnosed the mother with borderline personality disorder, a chronic personality impairment that leads to significant problems with relationships and overall functioning and can impact parenting ability. He also concluded that she suffers from dysthymic disorder, a low-grade chronic sadness.
According to Azar-Dickens, exposure to these types of disorders can seriously harm children, who require consistency and stability. He noted that J.L.S. and L.J.H. both have special needs and behavior issues, making stability and consistency particularly important. Azar-Dickens questioned the mother's judgment and her understanding of day-to-day parenting responsibilities, and he disputed her claim that the children could return immediately to her without any adverse effects. Ultimately, Azar-Dickens concluded that the mother was not competent to care for J.L.S. and L.J.H., that reunification would likely harm them, and that DFCS should not delay in finding them a permanent home.
The evidence further shows that the children have progressed since entering foster care. L.J.H.'s behavioral and emotional issues have improved through therapy and the efforts of his foster family. J.L.S., who suffers from Attention-Deficit/Hyperactivity Disorder and Oppositional Defiant Disorder, has benefitted from the structured environment offered by her foster placement. In addition, she receives specialized therapy to address issues associated with acting out sexually.
J.L.S.'s foster mother testified that J.L.S. has maintained contact with her mother by telephone, although the mother's telephone service has been disconnected several times, impeding these efforts. The foster mother also testified, however, that J.L.S. often "act[ed] out" and had behavioral problems in school after contact with her mother.
Based on this and other evidence, the juvenile court terminated the mother's parental rights to J.L.S. and L.J.H. We find no error.
Before terminating parental rights, the juvenile court conducts a two-step analysis. It must first find parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) a lack of proper parental care or control caused the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the child.[3] If these factors exist, the juvenile court must then determine "whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition *879 and needs, including the need for a secure, stable home."[4]
1. Deprivation. The juvenile court found the children deprived in May 2004 and reaffirmed that finding in subsequent orders. The mother did not appeal the juvenile court's deprivation orders, and she raises no argument in this appeal regarding deprivation. Accordingly, she is bound by the prior deprivation finding.[5]
2. Lack of proper parental care or control. The juvenile court determined that the mother's lack of proper parental care or control caused the children's deprivation. We agree.
In reaching its conclusion, the juvenile court found that the mother suffers from a medically verifiable mental deficiency. Under OCGA § 15-11-94(b)(4)(B)(i), this type of deficiency shall be considered in determining whether a child lacks parental care or control if it is "of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child."
On appeal, the mother argues that she is not "unable to provide" for her children. But Azar-Dickens offered evidence to the contrary. He testified that the mother suffers from two mental health conditions that impair her overall functioning and leave her incompetent to care for her special needs children. Such testimony supports the trial court's finding regarding the mother's medically verifiable deficiency.[6]
Moreover, at the time the children were taken into state custody, the mother had left them for several months with a caregiver who subjected J.L.S. to abuse. The mother moved to Florida and, between May 2004 and the October 2007 termination hearing, made little effort to visit the children. Although she saw them occasionally when she appeared in Georgia for court proceedings, she did not travel to see them on any other occasion, despite DFCS's offer to bring the children to the Georgia-Florida border. As a result, the mother has no bond with L.J.H., and her limited bond with J.L.S. lacks a mother-daughter intimacy.
The evidence further shows that the mother did not complete her reunification case plan. At the time of the hearing, she was not employed and lacked housing sufficient for J.L.S. and L.J.H. She also revealed little understanding for her children's significant special needs, asserting at the hearing that they could be removed from their stable foster homes and returned to her immediately.
Although the mother blames her failure to visit the children on "the distance involved," that distance does not excuse her minimal effort to maintain a meaningful bond with J.L.S. or establish a bond with L.J.H. And despite her argument to the contrary, the mother's success in regaining custody of her two youngest children from the State of Florida does not require the same result here. Given the evidence presented, the juvenile court was authorized to conclude that a lack of parental care or control caused the children's deprivation.[7]
3. Continued deprivation. The evidence also demonstrates a likelihood of continuing deprivation. In evaluating this factor, the juvenile court was authorized to consider the mother's past conduct, including her propensity to temporarily sign away custody of her children to various people.[8] Moreover, the mother's mental health issues impair her judgment and leave her incompetent to care for J.L.S. and L.J.H.[9] These *880 issues, as well as her past conduct and failure to maintain a meaningful bond with the children, support the juvenile court's determination.[10]
4. Harm to the child. Both children need stability and consistency, particularly given their special needs and behavior problems. The evidence shows that the mother is not competent to provide this stability, and Azar-Dickens testified that reunification would be detrimental to the children. Accordingly, the evidence demonstrates that continued deprivation will likely harm J.L.S. and L.J.H.[11]
5. Best interest of the child. The mother has no bond with L.J.H. and a limited bond with J.L.S., who acts out following contact with her. Both children have special needs that the mother is unequipped to handle. The children's behavior has improved since DFCS took custody, and DFCS had identified adoptive placements for both. Under these circumstances, the clear and convincing evidence supports the conclusion that termination would be in the children's best interests.[12]
Judgment affirmed.
BARNES, C.J., and PHIPPS, J., concur.
NOTES
[1] In the Interest of B.W., 287 Ga.App. 54, 62, 651 S.E.2d 332 (2007).
[2] (Footnote omitted.) Id.
[3] See Id.
[4] (Footnote omitted.) Id.
[5] See In the Interest of D.B.C., 292 Ga.App. 487, 494(1)(a), 664 S.E.2d 848 (2008).
[6] See In the Interest of B.W., supra at 66(5), 651 S.E.2d 332; In the Interest of K.N., 272 Ga.App. 45, 53(a)(2), 611 S.E.2d 713 (2005).
[7] See In the Interest of D.B.C., supra at 495; In the Interest of K.N., supra at 52-53, 611 S.E.2d 713.
[8] See In the Interest of B.W., supra at 67(6), 651 S.E.2d 332 ("A court can consider a parent's past conduct in determining whether conditions of deprivation are likely to continue.") (footnote omitted).
[9] See, e.g., id. at 66(6), 651 S.E.2d 332 ("[E]vidence that a parent's intellectual functioning would make it very hard to raise a child alone supports a finding of the likelihood of future deprivation.") (footnote omitted).
[10] See id. at 66-67(6), 651 S.E.2d 332.
[11] See In the Interest of S.W.J.P.D., III, 279 Ga. App. 226, 230(1)(d), 630 S.E.2d 824 (2006); In the Interest of K.N., supra at 54(a)(4), 611 S.E.2d 713; see also In the Interest of D.B.C., supra at 496(1)(d), 664 S.E.2d 848 ("It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." citation and punctuation omitted).
[12] See In the Interest of B.W., supra at 67-68(8), 651 S.E.2d 332; In the Interest of S.W.J.P.D., III, supra at 230(2), 630 S.E.2d 824; In the Interest of K.N., supra at 54(b), 611 S.E.2d 713.